(Decided June 17th, 1896).

## *THE CANAL COMPANY'S CASE.

*Extension of Time During which Trustees Under a Mortgage were authorized to Operate the Chesapeake and Ohio Canal—Priorities Between a Mortgage to the State Upon the Property of the Canal and a Mortgage to Individuals Upon the Revenues and Tolls— When a Sale of the Canal May be Decreed—Waiver of State's Priority—Rights of Mortgagee in Possession as to Mode of Operation.*

The State of Maryland was the holder of mortgage liens upon the property, tolls and revenues of the Chesapeake and Ohio Canal, when, by the Act of 1844, chap. 281, it authorized the issue by the company of bonds secured by mortgage, to be preferred liens upon the revenues and tolls of the company, and the lien of the State was waived so as to make such bonds preferred liens on said revenues. A mortgage to secure such bonds was accordingly executed in 1848, by which the revenues and tolls of the company were conveyed to trustees by way of mortgage, who were authorized to collect the same in case of default. Under the Act of 1878, chap. 58, other bonds were issued which were conceded to be the first lien on the property and revenues of the canal as against the State and the bondholders under the Act of 1844. In 1890, the trustees for those bondholders filed a bill setting forth the broken and wrecked condition of the canal itself and the insolvency of the company. Upon

---

*The docket title of this case was *The State of Maryland* v. *John K. Cowen, et al.*, Trustees.

this bill a decree was made, authorizing the trustees for the bond-
holders of 1844 to take possession of the canal, and repair and oper-
ate the same for four years ; and it was provided that if, at the end
of that time, the revenues should not be sufficient to pay for restor-
ing the canal and the operating expenses, such failure in the tolls
should be regarded as conclusive evidence (unless the time be
extended by the Court) that the canal could not be operated so as to
produce revenue with which to pay the bonded indebtedness, and
the right was then reserved to the Court to decree a sale of the
canal. The trustees took possession, expending a large sum of
money in restoring the canal, and prior to the expiration of the four
years mentioned in the decree applied for an extension of the time
during which they might retain control, alleging that the canal
would be able to pay something out of the revenues on account of
the bonded indebtedness. It was objected by the State that the
application for an extension of time was premature, also that the
trustees were not entitled to the further aid of equity, and that the
State had a right under its first mortgage of the *corpus* of the canal
to demand a sale of the same free from the claims of the bond-
holders, the contention of the State being that its lien on the whole
canal was by the Act of 1844 waived only so far as to give to the
bondholders under that Act a lien upon the revenues and tolls.
*Held,*

1st. That the trustees for the bondholders of 1844, who had taken pos-
session of the canal when in a ruined condition and expended nearly
$500,000 in putting it in good condition, were entitled to an extension
of time in which to operate the canal, the business of the same hav-
ing been largely increased under their management, and the order
of the lower Court granting such extension for six years is affirmed.

2nd. That assuming that the parties representing the bonds of 1844
have a lien only on the net revenue and tolls and have no lien on
the proceeds of the sale of the *corpus* of the canal, then a sale of
the same under the mortgages to the State would absolutely de-
stroy their lien on the tolls, and such sale will not be decreed until
it appears that the canal cannot be operated so as to produce reve-
nue applicable to the payment of the bonds.

3rd. That until it appears that the lien of the trustees on the net reve-
nues is worthless, the same cannot be impaired by the State, which
had waived its lien in favor of the bondholders represented by the
trustees.

4th. The the lien of the bondholders under the Act of 1844 is lim-
ited to the net revenues and tolls of the canal.

5th. That the amount expended by the trustees in restoring the canal
should be paid, with interest, from the tolls and revenue.

The trustees in possession were properly authorized by the lower
Court to make a contract with a transportation company for the

use of the canal for a fixed sum, subject to the control of the Court, such contract enabling the trustees to operate the canal advantageously.

The State, by the Act of 1896, waived its lien on the canal in favor of certain labor claims. *Held*, that since their priority was not passed upon by the order appealed from, they could not be disposed of by this Court.

Appeal from an order of the Circuit Court for Washington County.  A former appeal involving some of the questions arising on this appeal is reported in *State* v. *Brown*, 73 Md. 484.  The decretal order entered on October 2, 1890, and affirmed in that case, by which trustees representing certain bondholders were authorized to take possession of the Chesapeake and Ohio Canal, and to repair and operate it as a waterway, provided as follows :

" Sixth.  That if, at the end of four years from the first day of May next, there shall not have been tolls and revenues derived from the said canal, and the property and rights appurtenant thereto (over and above the amount necessary to pay current operative expenses, and to keep the canal in repair), to liquidate and discharge the amount of the cost of repairing and restoring the canal to a working condition from its present broken condition, and the amount of money required to pay expenses and compensation to the receivers, and to pay any amount that may be determined to be a preferred lien on such tolls and revenues for labor and supplies furnished to the canal company, such failure in tolls and revenues shall be regarded as evidence conclusive (unless the time be extended by the Court for good and sufficient cause shown), that the said canal cannot be operated so as to produce revenue, with which to pay the bonded indebtedness of said company, the right and power is hereby reserved to this Court to order and direct the execution of the foregoing decree of sale."

On January 30, 1894, the surviving trustees filed a report and petition in the lower Court in which they set forth :

"1. That in accordance with the decrees and orders of this Court in these consolidated causes and the decree and order of the Supreme Court of the District of Columbia, dated November 1st, 1890, and entered in the like causes therein pending, under which decrees and orders these trustees were put in possession of the Chesapeake and Ohio Canal, they proceeded with all possible speed to repair the canal and put the same in good condition as a waterway. As the work of repairs progressed it was found that the eighteen months during which the canal was practically abandoned and dried out had added much to the damage caused by the flood of 1889, and had also weakened the canal at points untouched by the flood. It was also found that the walls of many of the locks and the gates in almost all the locks required renewal. These trustees have, nevertheless, carried out the work of repair and renewal, although at a cost far exceeding what they had anticipated.

" Owing to the extent of the repairs required and to the unfavorable weather encountered, the water was not turned into the canal throughout its length until the month of August, 1891. Traffic did not fairly begin to move until September 1st, 1891. From the latter date till the close of navigation in that year the canal remained open for the passage of boats, with some short interruptions ; but the amount of traffic transported was small, owing to the scarcity of boats. Few of the boats used on the canal before the flood of June, 1889, were even capable of repair in 1891. The work of repair by these trustees did not cease with the opening of the canal for the passage of boats. Throughout the year 1891, and indeed during the year 1892 and the winter of 1892–3, the repair of the canal and its works was continued, as the work could be done more economically.

" The canal is now in better condition as a waterway than ever before in its history. It has a depth of six feet throughout its length for loaded boats, and as a consequence the average loading of the boats was heavier during the last boating season than ever before, despite the extremely low water in the Potomac River.

" 2. These trustees have borrowed for the purpose of making said repairs $435,163.34. Their receipts from net tolls, rents and other sources to December 1st, 1893, have been $270,970.73. Their expenditures have been for the repair of the canal and its works, under the orders of the Courts, $430,764.43 ; for other accounts, $250,327.17. This statement does not include $15,000 borrowed and paid as the compensation of the receivers of this Court and the Supreme Court of the District of Columbia.

" 3. When these trustees received possession of the canal, not only was the canal itself damaged by flood and doubly damaged by the delay in repairing it, but the canal as a business enterprise and a means of transportation was discredited. Its traffic had sought other routes and other methods of transportation. The port of Georgetown had lost its standing as a coal shipping port and vessels no longer sought it for cargoes of coal. Shippers of coal did not believe that the business of the canal could be revived, and coal shipped coastwise from Georgetown. The boats on the canal during 1891 numbered only ninety. Even after the restoration of the canal as a waterway became an accomplished fact, those who would have otherwise been willing to renew their investments of former years in canal boats and equipment, were deterred by the provisions of sub-section 6 of section 5 of the decree of this Court, entered herein October 2, 1890. Those provisions were regarded as limiting the possession of these trustees to four years, and the uncertainty as to the maintenance of the canal as a waterway after the expiration of four years prevented such investments by all except those sufficiently interested otherwise in the success of these trustees to take the risk. During the season of 1892 the number of boats on the canal increased to one hundred and eighty-two, representing with their equipment an additional investment of about $150,000. During 1893 the number has not materially increased, although some new boats have taken the places of old ones.

" 4.. The provisions of sub-section 6 of section 5 of the decree entered in this cause October 2, 1890, have operated also to hamper greatly these trustees in the collection of the rents and revenues otherwise collectable for the occupation of the lands of the canal company and the use of water from the canal as a motive power. The apparent limitation of the possession of the trustees to four years has induced many holders of long term leases from the canal company (many of which reserve a merely nominal rent) to dispute the rights of these trustees under the mortgages of 1848 and 1878. The hope of these lessees is that these trustees will be unable to dispossess them by legal process within the four years.   *   *   *   *

" 5. The provisions of said sub-section 6 have operated to prevent the recovery of much of the traffic which had been diverted from the canal, as already stated, but which would have returned to it had it not been for those provisions. Shippers of coal have been and are unwilling to break up their arrangements with the railroad carriers and ship again by. canal, because the order of Court, under which the trustees held possession, seems to treat their operation of the canal as an experiment limited to four years duration.

" Nevertheless, the business of the canal has grown in the face of the extraordinary obstacles above mentioned. In 1891 the number of tons of coal carried on the canal was 50,533.14, of which none were shipped coastwise from Georgetown. In 1892 the tons carried were 265,799.08, of which 92,369 tons went coastwise ; and in 1893 the tons carried rose to 336,295.11, and the tons coastwise to 146,997.14, an increase over the previous year in tons carried of 70,496.03. A reference to the reports of the Chesapeake and Ohio Canal Company filed in this cause will show that not since 1885 has the number of tons of coal carried equalled the number carried in 1893. The expense of maintaining and operating the canal does not increase with the increase of tonnage and traffic. For the year 1893

the canal has been more than self-sustaining from traffic alone. The revenue that will be derived from the further increase of the traffic will be net revenue, as will be also the revenue from increased rents. For the further growth of the traffic of the canal additional boats and equipment must be put in service thereon. No one will make the investment of money necessary to put such additional boats on the canal, unless the uncertainty be removed as to the right of these trustees to continue the maintenance and operation of the canal after the expiration of the four years mentioned in the said decree of October 2, 1890.

" 7. These trustees further report and show to the Court that they have negotiated a contract with the Chesapeake and Ohio Transportation Company of Washington County, a body corporate of the State of Maryland, recently organized for the purpose among others of conducting a forwarding or transportation business on the Chesapeake and Ohio Canal. By the terms of said contract the said transportation company agrees to furnish all the boats needed to transport traffic offering for transportation on the canal, and further agrees to guarantee to these trustees a fixed net revenue from their trust estate ; all of which will more fully appear by reference to a copy of said contract with these trustees, filed herewith, marked " Trustees' Exhibit A," and pray may be taken and read as part thereof. The said contract has been executed by the said transportation company and by these trustees upon the express condition that the same shall not be finally delivered or become effective, unless or until this Court shall by some proper order approve the execution of the same by these trustees, and also extend the period of four years from the first day of May, 1891, mentioned in sub-division 6 of section 5 of the said order or decree entered herein on the second day of October, 1890, so as to enable these trustees to carry out their agreement in said contract contained, to maintain and operate the said canal during the term of the contract.

" These trustees further state to the Court that the said contract will greatly benefit the trust estate im their charge.

" Wherefore these trustees and petitioners pray : 1. That an order may be entered herein ratifying and approving the execution by these trustees of the said agreement with the Chesapeake and Ohio Transportation Company of Washington County, and authorizing these trustees to deliver the same.   2. That such order provide further that the period of four years from the first day of May, 1891, mentioned in sub-section 6 of section 5 of the decree entered herein on the second day of October, 1890, be for good and sufficient cause shown extended till the end of ten years from the date of the entry of said order."

The Court below (STAKE, J.) passed an order by which it was adjudged " that the said trustees' petitioners have shown and do show good and sufficient cause for the extension by this Court, as prayed in said petition, of the period of four years mentioned in sub-section 6 of section 5 of the order and decree entered in these consolidated causes, on the second day of October, 1890 ; and doth further find and adjudge that the contract between said trustees and the said Chesapeake and Ohio Transportation Company of Washington County, mentioned in said petition, is one advantageous to the trust estate and proper to be executed by said trustees.   And the Court doth thereupon order, adjudge and decree, that the said trustees be and they are hereby authorized to execute and deliver said contract ; and doth further order, adjudge and decree, that the period of four years from the first day of May, 1891, mentioned in sub-section 6 of section 5 of the decree entered in these consolidated causes, on the second day of October, 1890, be and the same is hereby, for good and sufficient cause shown, extended to the end of six years from the first day of May, eighteen hundred and ninety-five."

The cause was argued at the October term, 1895, and a reargument was ordered as to the priority of liens at this term.

The cause was reargued before McSHERRY, C. J., BRYAN, FOWLER, BRISCOE, PAGE, ROBERTS and RUSSUM, JJ.

*Harry M. Clabaugh, Attorney-General,* and *John Prentiss Poe,* for the appellant.

For the State it will be argued : 1. That the cost of the repairs put upon the canal by the trustees of the bonds of 1844 under the privilege granted to them in the affirmed decree of October 2, 1890, upon their application to be placed in possession, is not a lien upon the canal, and accordingly that the trustees are not entitled to be reimbursed such cost out of the proceeds of sale. 2. That the repair bonds of 1878, issued under the Act of 1878, chapter 58, together with the unpaid interest thereon constitute the first lien and must first be paid in full. These bonds are secured by a first mortgage upon the *corpus* of the canal, and also upon its revenues. 3. That the mortgages held by the State are next in the order of priority, and are entitled to take precedence over the bonds of 1844.

The decree of 1890 ordered the sale of the canal, but suspended the execution of the decree, and postponed the sale for five years, with the right, upon good cause shown, to suspend the sale for a further period. It thus distinctly denied and rejected the claim of the trustees to complete possession of the canal, with the right to operate it *indefinitely* until the principal and interest of their bonds should be fully paid, and it also distinctly denied and rejected the prayer of the trustees that the sale should be made subject to their right, notwithstanding the sale, to still hold, repair and operate the canal, and take and apply the tolls and revenues to their use until their bonds should be fully paid.

By the decree the trustees were allowed the right to redeem the repair bonds of 1878, and to be subrogated to all their rights, and were declared to be entitled to possession of the canal upon such redemption ; but this possession was not to be *permanent* in recognition of any contractual right on their part to enter into possession by reason of the default of the canal company to pay their bonds, and to retain such possession until, under their management, their bonds should be paid, but was allowed to them

for *a limited period* in order that, at their own cost and expense, without lien on the *corpus* of the canal at all, and without lien on its revenues, except during the period of their possession for the purpose of reimbursement to them of such cost, they might, if they saw fit to do so, repair and restore the canal, and operate it by way of experiment, to see whether they could make it pay. If the experiment should prove to be a failure, the Court reserved the right and power to order the decree for sale to be executed. The trustees accepted this decree as a judicial determination of their rights. They did not appeal from it, but, on the contrary, insisted before this Court upon the appeal of the State that the decree was right and should be affirmed, *and it was affirmed.* It is now, therefore, the irreversible law of the case, binding upon all the parties to the suit, and especially binding upon the trustees of the bonds of 1844, who urged its affirmance here. The bondholders of 1844 are not now in a position to contend that the interpretation put by the Court below, and by this Court, upon the mortgage of 1848, executed for the purpose of giving " the fullest effect " to the Act of 1844, is erroneous, and that notwithstanding such interpretation embodied in the decree of the Court below, and affirmed at their instance, the contract between them, the canal company and the State, entitles them to retain possession of the canal and operate it until its revenues, under their management, shall be sufficient to extinguish their entire bonded debt.

The bondholders of 1844 have no lien on the *corpus* of the canal. By the clear terms of the Act of 1844, chapter 281, authorizing the issue of these bonds, the pledge by which they were to be secured was a pledge of the net tolls and revenues only of the canal company, and the State's waiver went no further than, but was merely co-extensive with, this pledge. Hence, in the distribution of the proceeds of sale these bonds are not entitled to participate until after the State's mortgage claims are fully paid. The claim of these bondholders is that notwithstanding the

State (which prior to the Act of 1844 had a first and paramount lien, covering by clear, distinct and definite terms the entire canal and its works, and also its tolls and revenues) waived and postponed its lien in their favor upon the net tolls and revenues only, and after making this waiver required a new mortgage to be made to it, covering also in express terms the canal, its works and also its revenues ; and notwithstanding these bondholders took their mortgage only upon the net tolls and revenues, yet now, when the security which they took has proved insufficient, a new and different and better security must be held to have been given them—that the waiver of the State is to be extended by implication beyond its terms and is to be made to be a waiver of its prior lien on the *corpus* of the canal as well as on *its net tolls and revenues,* and the lien upon the *net tolls and revenues* offered to and accepted by these bondholders is to be enlarged by construction and made equivalent to a lien upon the *corpus as well as upon the net revenues.*

The *limited* security which was tendered and upon which the bonds were negotiated is now claimed to be an *unlimited* security, not only upon the *net tolls,* but upon the *corpus,* which was in the most careful and express terms reserved from the pledge ; and simply to save these bondholders from a loss resulting from the unfortunate and greatly-to-be-regretted failure of the security, which, when it was accepted, was believed to be ample, the Court is called on to give them the benefit of a security which was never tendered to them, never asked for by them, never, until the imminence of loss made such a pretension necessary, supposed to have been given to or received by them, but which, with industrious precision, was most carefully withheld and excluded from the public statutory grant of the security offered to them when they were invited to take the bonds and upon which they relied when they made their investment. CHIEF JUDGE ALVEY, as has already been stated, after a careful examination of the whole sub-

ject and in an opinion that leaves nothing new to be said, held that this claim was without foundation, and that upon the unfortunate failure of the security which they accepted they are only entitled to occupy the position of ordinary non-lien creditors of the company. *Brown* v. *Ches. and Ohio Canal Co.*, 73 Md. 590–600. This is the proposition which the State now maintains, and this is the adjudication of her rights in her favor, upon which she now respectfully insists.

Here, too, there is a preliminary question to be considered. Are these bondholders, upon the case made by this record in a situation to dispute this contention of the State? In view of the averments made by them in their pleadings—in view of their last petition to the Court and the action which at their instance the Court took for their benefit, are they at liberty to claim that they have a lien upon the *corpus* of the canal and are entitled to have their bonds paid out of the net proceeds of sale? After demanding and being allowed the benefit of the right of redemption of the repair bonds of 1878, which were, by force of the State's waiver, *made a first lien upon both corpus and revenues of the canal company;* and after claiming and being allowed the right to be subrogated to *all* the rights and remedies held by these repair bonds (including the right to the *absolutely first* lien on the *corpus* of the canal) can these bondholders of 1844 deny the priority of the State's lien upon the *corpus* of the canal and upon the net proceeds of its sale, after the lien of these repair bonds upon such *corpus* shall have been extinguished by their payment to them as purchasers, and fairly *claim* even a priority over the State's mortgages? Are they not, in short, estopped by the record here, from setting up their present pretension? In their original bill, as already shown, they ask for a receiver upon the distinct and express ground that their lien extended only to the net tolls and revenues, and that they "*have no security for their debt other than the tolls and revenues of the canal.*" Can they "blow both hot and cold?" *Edes* v.

*Garey*, 46 Md. 41.   Can they disaffirm at one stage of the case what they affirmed at another stage of the same case ? *Hall* v. *McCann*, 51 Md. 351 ; *Boyce* v. *Fisher*, 81 Md. 52. Can they both " approbate and reprobate ? "  Can they ask the Court to give them a specific relief upon the plaintive and piteous averment that they have no lien upon the canal— no right to a foreclosure—no standing in Court to demand a share of the proceeds of sale if a sale be ordered upon the prayer of the State, which has a lien upon the *corpus*, and may, therefore, rightfully demand a sale, and then, when a sale is ordered, nimbly shift their position, repudiate their original attitude and claim to be entitled to the *first* paid out of the proceeds of sale, because they have a *first* lien upon the *corpus*, and possess, therefore, a legal right to a sale of the mortgaged property and all the fruits which such a right carries with it ?

But apart from these objections, the claim of these bondholders of 1844 to the priority which they assert, even if they were in a situation to urge it, cannot be maintained. To sustain it Your Honors must put upon the Act of 1844, and upon the mortgage of 1848 given to the original trustees of these bondholders, an interpretation of which, until very recently, they were never supposed to be susceptible. You must ignore and disregard the palpable distinction clearly, deliberately and purposely drawn in the Act of 1844 between a mortgage *on the canal, and all its property and works of every description*, and a mortgage upon its net *tolls and revenues* ONLY.   You must attribute to the State an intent to waive and postpone in favor of these bonds her *first lien* upon the *corpus* of the canal, when the act authorizing the bonds, after most plainly and carefully referring to her prior mortgage on both corpus and revenue, waived only her mortgage upon *net revenues*.   You must hold that in waiving her prior lien on *tolls and revenues* and carefully reserving her prior lien on *corpus* she intended ALSO to waive her lien on corpus in the face of her express reservation of such lien.   You must hold that the supposed doctrine re-

lied on by these bondholders that a grant or mortgage of
the rents, profits and revenues of a piece of real estate is in
law and equity such an absolute and inflexible grant or
mortgage of the real estate itself that no actual intent, how-
ever plain, that the grant or mortgage shall not have such
effect, shall prevail against such doctrine.   You must de-
clare that a mortgage upon the revenues of a public work
so means and includes and is equivalent to a mortgage
upon the public work itself and all its real estate and prop-
erty of every description, that no agreement or intent be-
tent between the parties, however distinct and express, can
give any other meaning or effect to the transaction.   You
must announce it as your opinion that there is something in a
mortgage of the net revenues of such a work so inseparably
interwoven with the *corpus* that the two *must* go together,
and that when a person lends money on the *income* and ex-
pressly stipulates that his security does not and shall not be
understood as extending to the corpus, it nevertheless does
so inherently extend to it that it cannot be severed or di-
vested.   In order to reach such a conclusion you must say
that *Garrett* v. *May*, 19 Md. 177, in which your predeces-
sors held against the same authorities relied on here, that *a
pledge of all the income or revenues of a railroad did not
amount to a pledge of the road itself creating an equitable
mortgage on the road, its franchises and revenues*, was erron-
eously decided.   And you must overrule the judgment of
this Court in *Virginia* v. *C. & O. Canal Co.*, 32 Md. 501.

*John K. Cowen* and *Hugh L. Bond, Jr.* (with whom was
*C. F. T. Beale* on the brief), for the appellees.

By the mortgage of June 5th, 1848, the canal company
conveyed "the revenues and tolls of the *entire and every
part* of the canal and its works between Cumberland and
Georgetown."   By section 2 of the Act of 1844, chapter
281, the State had agreed that these bonds "shall be pre-
ferred liens on the revenues and tolls that may accrue to the
said company from the entire and every part of the canal

and its works between Georgetown and Cumberland, which are hereby pledged and appropriated to the payment of the same and the interest to accrue thereon;" and by the 4th, 7th and 10th sections had provided that her own rights and liens should be waived, deferred and postponed in favor of these bonds, and be subject to the liens and pledges created or authorized by the Act, reserving only the right to redeem by paying the bonds and the interest thereon.  Certainly the State's contract and waiver are as broad as the canal company's grant.

1. *This grant of all the tolls and revenues carries the entire beneficial ownership.*  "It is not, however, necessary that the deed should in terms convey the land or thing intended to be granted if such grant is implied from what is described.  Thus a grant of the rents, issues and profits of a tract of land is the grant of the land itself.  If the grant be of the use of and dominion over land it carries the land itself."  *Washburn on Real Property*, Book 3, ch. 5, secs. 4, 23.  *Caldwell* v. *Fulton*, 31 Pa. St. 484; *Legard* v. *Hodges*, 3 Brown's, Ch. Cas. 530; *Green* v. *Biddle*, 8 *Wheaton*, 76; *Income Tax cases*, 158 U. S. 601, U. S.; *Southeastern Ry. Co.* v. *Jortin*, 6 H. L. C. 424; *Ketchum* v. *St. Louis*, 101 U. S. 306.

2. *What are the grounds of the contention that the grant by the canal company and the contract of the State did not create a preferred lien on the canal?*  We have shown that by the uniform and established principles of law, applicable to the construction of conveyances and of contracts concerning real and personal property and public works, the effect of the mortgage of 1848, and of the Act of 1844, chapter 281, would be to create a preferred lien on the canal and its works.  The contention of the State now is, that those established principles of law do not apply, and that no lien was created.  Why?  Can it be supposed, in the face of the authorities cited, that these principles of law were unknown to the parties making these contracts?  To change the natural legal import of these contracts, must there not be

shown some clear and controlling intention and understanding that the contracts should not so operate? The whole argument for the State is contained in the opinion of JUDGE ALVEY.

We submit that even if no reasons appeared why the transaction on the State's part took the form it did take, yet the circumstances mentioned by JUDGE ALVEY could not be held to contradict the legal import of the State's contract. The State authorized and assented to a form of conveyance the legal effect of which had been settled in the law for hundreds of years. The presumption that the conveyance was to have its legal effect cannot be rebutted by mere inferences. Certainly the mere fact that the conveyance was authorized in that form, and not in another form, can have no weight. But the reason why the State prescribed the particular form of mortgage appears on the face of the Act of 1844 itself. We quote Mr. Bernard Carter's admirable brief on the original appeal in this case:

"What did it do, and why did it do what it did do, in this regard? The State of Maryland, in chartering the canal company, and in assisting with the large sums of money it had spent on it, was moved by large expectations of great benefit to the State and its people, by the construction of what, in those days, was looked upon as a great public work; and it was well known that even when completed, it might, in its early history, have to struggle with difficulties which might prevent prompt payment of the interest on the bonds about to be issued; this is apparent on the very face of the Act of 1844: therefore, the State determined that it would, while waiving all beneficial interest or ownership on its part in the property of the canal company, by giving to the bonds to be issued to complete the canal, an absolute and preferred lien on all the revenues of the company, at the same time make such provision that every opportunity should be given to the company to live, and under its management controlled by the State, through its ownership of the majority of the stock, to serve the great public purposes for which it had been created.

"Acting upon this view, there was incorporated those provisions in the Act of 1844 which declared that, while all the revenues of the company should be devoted to the payment of the interest on the bonds, and eventually to the payment of the principal, yet enough of these revenues should, in the first place, be taken for the purpose of paying the expenses and repairs necessary to keep the canal in operation and as a going concern; in other words, that as long as the canal company could, from its earnings, pay its expenses and keep its work in repair, so as to keep open and in operation this great (*as it was expected to be*) waterway, it should be *so kept open* and in operation; and if it took all its earnings to do so, so that there was nothing left of said earnings to be applied to the interest and principal of said bonds, the bondholders must be content, as long as the canal was thus *running*, to go without payment; provided, always, such failure of earnings was not owing to want of business caused by faulty management by the company.   In support of these views, see 32 *Md.* 535; 26 *Md.* 310.

" The two great objects which the State sought to accomplish in the plan embodied in the Act of 1844 (and which are apparent on its face) were, 1st, to get the canal completed to Cumberland; 2nd, to so arrange matters that the highway should be kept in operation to subserve the great public benefit which it was supposed it would be to the State at large and her people, and that it should be in charge of the company, in which she had a controlling voice; and, *provided*, any persons could be found to advance the money on terms which would accomplish these two objects, she was perfectly willing, in their favor, to *subordinate* all *pecuniary* claims which she had in the property of the company, under her mortgages.   Therefore, in pursuance of this plan, and to accomplish these objects, the bondholders were not given a mortgage on the land and works of the company, which, if accompanied with the rights usually attendant on such mortgages, would have given the mortgagees the right, on default, to sell the canal property, and thus oust the

company and the State from its control; but a first and absolute lien was given on the entire revenues derivable from the property of the company, which as effectually transferred to them all the beneficial interest in the property of the canal held by the State, until their debts were paid, and yet retained the control of the management of the canal in the company, and so, under the control of the State.

"If the State was not willing that the money necessary to finish the canal should be furnished on any plan which should involve the risk of stopping the operations of the canal, or taking them out of the hands of the company she had (in part) created, and which she controlled, as long as the affairs of the company were not negligently managed, what benefit would have been conferred on the bondholders by taking a mortgage on the body and works of the canal, which was not acquired by them by a mortgage on the entire revenues of the canal and all the property of the company? If they could not, on default made in the payment of their interest, on, their own motion, sell out the canal, (and we have seen that this the State was not willing to agree to), and if, as we have seen, the conveyance to them, *in fee*, of the entire revenues of the canal, transferred to them, until their debt was paid, the entire *beneficial interest* in the whole property of the company, then they had no object in seeking a conveyance of the land and works out of which the revenues grew.

"Therefore, though the State at the time of the passage of the Act of 1844 had mortgages which, by their terms, conveyed the lands, property and tolls and revenues of· the company, and, though the mortgage to the bondholders did not, in terms, convey anything but the entire revenues of the company, yet from the foregoing *it clearly appears* that the absence from the mortgage to the bondholders of any conveyance, in terms, of the land and works was not intended in any way to minimize or detract from the usual, and, indeed, necessary effect of a transfer of the whole revenues of an estate, which, as we have seen, as long as it ex-

ists, is a transfer of the entire beneficial interest in the prop-
erty, but that this mode of mortgage was adopted to make
the protection of the bondholders consistent with the plan
determined upon of keeping the canal in operation, and in
operation under the control of the State, as long as the
revenues to be derived therefrom were sufficient to keep it
in operation.

" Now, no doubt, it is true, and the appellant in no way
contends to the contrary, that at the time the bonds of 1844
were issued it was supposed that the revenues of the com-
pany would be sufficient in time to pay the bonds.    But
this fact in no way affects the legal rights of the parties ;
these are to depend on the legal effect and operation of the
Act of 1844, and the mortgage issued thereunder, when
those instruments are given that construction which the *es-
tablished principles of the law permit and require.*"

Are not Mr. Carter's reasons the more reasonable ?    Do
they not explain the distinction which the Act made be-
tween the mortgage to secure the new loan and the mort-
gage to the State?    The contract of the State, as inter-
preted by the other side, is a legal monstrosity.    The sup-
posed divorce of the tolls and revenues of the property from
the property itself is impossible in law and unthinkable in
reason.    The very reason of the doctrine that the disposi-
tion of all the income of property disposes of the property
is, that no other doctrine is consistent with reason.    As Mr.
Carter says, it is axiomatic.    The attempt to apply any
other doctrine leads to the *reductio ad absurdum* at every
turn.

When the State of Maryland has agreed that the bond-
holders of 1844 shall have the possession of the Chesapeake
and Ohio Canal, and shall take its tolls and revenues until
their bonds and interest thereon are fully paid, no Court in
Maryland has the constitutional power to say to those bond-
holders :    " Come, we do not think your contract is bene-
ficial to you ; we'll sell the canal and give the money to the
State."    Should the Legislature attempt to do that thing,

would this Court hesitate to declare the law unconstitutional? Whence do Courts of Equity derive the power to abrogate contracts lawful in themselves? This question is in no way affected by the decree of October 2, 1890. In that decree JUDGE ALVEY did reserve the power to sell under certain circumstances, but he did not reserve, or attempt to reserve, the power to sell and give all the proceeds of sale to the State. The reservation of the power to direct a sale was so framed as to leave the question open to the future decision of the Court. While the construction given it by the public has done great injury to the business of the trustees, the reservation was so framed as not to constitute a decision on the rights of the parties, and did not in law constitute a ground for appeal by the trustees. The present question, to-wit: The power of the Court to take the canal from the trustees and sell it and appropriate the proceeds to the State so as absolutely to destroy the bonds of 1844; this question was not decided by JUDGE ALVEY's decree. 73 *Md.* 515. The State asks for the sale only on the condition that the proceeds be given to her and not to the bondholders of 1844. Her application raises squarely the question of the power of the Court to abrogate a contract lawful in itself, the making of which was induced by the very party who now seeks its destruction, and of which that party, and that party alone, has received the benefits. The State's contract with these bondholders was enforced by this Court in 1891, in this cause. It was certainly in existence then. What has happened since to destroy it? The trustees have spent $430,000 in repairs on the security of it. The canal is a going concern, producing net revenues over and above the expenses of operation, repair and improvement. There are now in the trustees' hands $60,150.18, derived from the operation of the canal and its works. Have these facts operated to destroy the contract?

The only answer the State makes is that the canal has not produced enough net revenues. Does the Act of 1844 provide that the mortgage shall be defeasible, if the net

revenues of the canal be small, or even if they be nothing ? On the contrary, the act recognizes the continued existence of the mortgage in case of the failure of revenue. The question recurs, then, can the Court decree a defeasance of the mortgage because the net revenues have been small ? To decree the defeasance of the mortgage is an entirely different and distinct act from decreeing a sale. We admit that smallness of revenues, unless there be prospect of an increase, would constitute ground on which the Court might say : " This method of paying off the debts is too slow. The Court will realize a fund from the property, and will distribute it to the creditors in the same order in which they would respectively be entitled to receive payment from the net revenues. Thus deferred creditors will not be forced to wait so long, and lose interest on their distributive shares." So far the power of a Court of Equity extends, but no farther.

The exercise of power which the State is asking here is entirely different. She asks that the fund realized from the sale be distributed, not in the order of priority in which the net revenues would be distributed, but to her, to the exclusion of those who, by her own contract, are entitled to be preferred over her in the distribution of the revenues. By her contract she agreed that her own claims should be " waived, deferred and postponed " until these bonds were fully paid out of the revenues, and that the bondholders, through their trustees, should have possession for the purpose of appropriating the revenues to the bonds. If now the State finds that method of payment too slow, and asks for a conversion of the property into money, she must pay those bonds out of the money realized before paying herself ; otherwise she would repudiate her contract.

But there seems to be lurking in the minds of counsel for the State an idea that if they can impress the Court with the opinion that the contract rights of the bondholders of 1844 are of small value, the Court will disregard those rights altogether, and will decree their destruction. From

this idea springs the constant effort to belittle what the trustees have accomplished. The repair and operation of the canal by the trustees is described as "an experiment which has proved a dismal failure," &c., &c. Whence does a Court of Equity derive the power to rescind a contract and release the obligor, on the ground that he thinks, or the Court thinks, that the contract is of no great value to the obligee? Hitherto, we believe, the rule has been that contracts should be rescinded only by the voluntary consent of the parties. When the opinion of a Court as to the value of the contract shall determine its binding force, the inviolability of contracts will have ceased to exist.

*Benjamin A. Richmond*, for the labor claims.

FOWLER, J., delivered the opinion of the Court.

This appeal presents questions growing out of the controversy between the State of Maryland and various classes of creditors having liens against the Chesapeake and Ohio Canal, its property, franchises, revenues and tolls. The State is the largest creditor, and next to it stands the appellees, who represent the bonds issued under the Act of 1844, ch. 281, as well as those of 1878, ch. 58, generally known as repair bonds, which latter are conceded to be a prior lien on the canal, its property and revenues, so far at least as concerns the claim of either the State under its mortgages or of the appellees under the Act of 1844, ch. 281.

While the history of the canal and the relation of the State to it as creditor and the legislation which from time to time has been adopted by the State for the purpose of waiving its liens in favor of others, are so well known that it would be useless to refer to it here, it will be necessary, in order to have an intelligent understanding of the questions before us, to examine the decree in this case which we affirmed on the former appeal and which is reported in 73 *Md.* 503, as well as to refer somewhat fully to the opinion

of this Court in that case, which was delivered by the late CHIEF JUDGE ROBINSON.

The decree which we have said was affirmed in 73 *Md.* provided that upon certain conditions therein prescribed the appellees should take possession and control of the canal, together with its rights and property, with power and authority to use and exercise the franchises of said company and operate the said canal to the same extent that said company could do. Provision was made for the disposition of the net revenues, and in the sixth section of the decree it was provided that if at the end of four years from the first day of May, 1891, there should not be tolls and revenue over and above the amount necessary to pay current operative expenses and to keep the canal in repair, sufficient to liquidate and discharge the amount of repairing and restoring the canal to a working condition from its then broken condition, and the amount necessary to pay expense and compensation to the receivers, and also certain other expenses not necessary now to mention " such failure in the tolls and revenues was to be regarded as evidence conclusive (unless the time be extended by the Court for good and sufficient cause shown) that the said canal cannot be operated so as to produce revenue with which to pay the bonded indebtedness of the said canal company." It was also one of the provisions of that decree that whenever it shall clearly appear that the said canal cannot be operated by the said trustees so as to produce revenue with which to pay the bonded indebtedness of said company, the right and power was reserved to the Court to order and direct a sale, as provided by that decree.

Prior to the expiration of the four years mentioned in the decree, during which the appellees were to possess and operate the canal, they applied by petition to the Circuit Court for Washington County for the extension of time they were authorized to ask for by said decree, for the purpose, as they allege, that they might have an opportunity under better auspices to demonstrate that the canal would,

with proper management pay annually out of its net tolls and revenues something on account of and in reduction of its bonded indebtedness.   The State, through its Attorney-General, resisted this application, first, upon the ground that it was premature, and secondly, because, assuming that the Court below had the power upon a proper case to grant the extension, the appellees had failed to make out such a case as called for the further interposition of the powers of a Court of Equity.   But the Circuit Court having come to the conclusion that the appellees had shown good and sufficient cause, on the 15th February, 1895, passed an order so declaring and directing that the said period of four years fixed by the decree should be extended to the end of six years from the first day of May, 1895.   From this order the State has appealed.

It was not seriously contended in argument that if a proper case was made, the Court did not have power to pass the order appealed from, and we shall therefore proceed at once to consider the question presented.   But before doing so, it is proper to mention the fact, that after the question as to the extension of time, which was regarded as the only one directly presented by this appeal, was argued in this Court, we acquiesced in the request expressed at the hearing, that before passing upon the question of sale *vel non*, the question as to the priority of liens as between the State and the appellees, should be fully presented, so that in case this Court should come to the conclusion that a sale should be had, there need be no further delay caused by reason of the uncertainty of the rights of the State or of the appellees in respect to their respective liens—it being apparent, as we said in 73 Md., that the question as to the priority of liens is one " which the parties are entitled as matter of right to have decided before a sale is made."

The principal question with which we are confronted at the very outset is whether the canal shall be sold.   In order to solve this question in a satisfactory manner it will be necessary to point out the relations of the parties to each other

and to the encumbered property, and thus to ascertain their respective rights in and to said property.    There can be, we think, no difficulty in so doing, for these rights and relations, with one exception, have been so clearly and fully fixed by what we said on the former appeal (73 Md.) that we need only refer to and cite portions of that opinion to show what these rights and relations are.

What, then, was decided on the former appeal?    We affirmed the decree of the Circuit Court for Washington County, holding, first, that these appellees were, by virtue of their rights under the Act of 1844 and the mortgage of June 6th, 1848, which was executed in pursuance of said Act, as well as because of their rights as trustees for the holders of the bonds issued under the Act of 1878, ch. 58, entitled to take possession of the canal upon the terms prescribed by the decree ;    second, that the appellees being lawfully entitled to the possession of the canal under the decree, they must "be allowed to put it in a condition to produce revenue—otherwise its possession would be without benefit to them."    It was, however, contended on the former appeals as now, by the State, that whatever may be the rights of the appellees, as against the mortgagor, the canal company, the State has superior rights under its long overdue mortgage, and especially the right thereby to demand an immediate sale of the entire canal and its franchises —free from any claim of the appellees as trustees·under the Act of 1844.    The attempt to enforce this right was thus commented on in 73 Md.:

"Now upon what grounds can this right be supported? To induce the bondholders of 1844 to furnish the money necessary to complete the canal, the State not only agreed to waive its own liens upon its revenues, but agreed, also, that the company should pledge them by mortgage as security for the payment of these bonds.    And now, when the State and the company have operated the canal till they are no longer able to operate it, and when the canal itself is no longer in a condition to earn revenue, and the com-

pany, during all these forty years, has been in default in the
payment of its indebtedness, according to the terms of the
mortgage, and when the bondholders ask to be allowed to
take possession of the canal, and to repair and operate it
for the purpose of ascertaining whether it can be made to
produce any revenue applicable to the payment of the
mortgage, the State interposes and insists that it shall be
sold *clear of the liens of these bondholders, which the State
agreed should be preferred liens* upon its revenues, and
when it is sold, the State further claims as against them,
the entire proceeds of sale, because their liens, it is said,
extend to the revenues only, and not to the property of the
canal.    In other words, the State insists that they shall be
deprived of the only remedy open to them by which they may
have the opportunity, at least, of reimbursing themselves
for the money which they, at the instance of the State,
furnished to finish the canal.    So it is not the case even
*of a junior incumbrancer* asking for the sale of mortgaged
property, and the proceeds of sale to be applied to the pay-
ment of *the several liens upon it, according to their priority ;*
but it is one in which the State, holding liens upon the
revenues and property of an unfinished canal, in order to
induce others to furnish the money necessary to finish it,
waives its own liens upon the revenues in favor of such
persons, and then insists that the canal shall be sold,
whereby these liens are destroyed.    *We do not see on
what ground, legal or equitable, such a contention as this
can be supported."*

Such being the rights of the parties, and the appellees
having been in possession of the canal for the past four
years, and the right of the State to demand a sale having
been thus denied by us in 1891, when the canal was in a
broken and useless condition, what has happened since
that time which would justify us in now ordering a sale?

This brings us to the consideration of the direct question
presented by this appeal, namely, should the application for
an extension of time be favorably considered.    The answer

to this question depends upon the terms and conditions of the decree, which, as we have seen, has already been affirmed, and the facts relied on by the appellees, which we do not understand to have been seriously denied to show that, as a matter of justice and equity, the extension of time asked asked for, should be allowed. As we have seen were held in the former appeal (73 Md.) that not to have granted the appellee's possession of and time to operate the canal for the benefit of their *cestuis que trustent* would have been inequitable as well as illegal under the then existing circumstances. Then the canal was a wreck —useless for any of the purposes for which it was intended; now it has been restored. Then the appellees had not expended nearly half a million dollars, which they have since done, in restoring it to its unprecedented good condition. It is apparent also that it was impossible then to know definitely what would be the effect upon the future business of the canal of the conditions under which the appellees took possession. The amount of money as well as the length of time required to repair the canal could only be estimated, and the many difficulties encountered by the appellees as set forth in their petition and brief, could not possibly have been foreseen, nor could they have been provided for, except by the wise provision which was inserted in the decree providing for an extension of time upon showing good and sufficient cause. If it was inequitable to deny the appellees possession of the canal in 1891, we think it would be even more so now, when, in addition to the loss they would then have sustained by a sale, they would, according to the State's contention, now lose also the large amount they were authorized under the decree to spend in repairs and restoration.

But, irrespective of the right of the appellees to possession upon equitable grounds, based on the facts set forth in their petition, and the conditions upon which they took possession, we do not think that the State can maintain its right to a sale upon any fair or reasonable construction of the Act

of 1844, ch. 281, its mortgage of January 8th, 1846, and
that of the appellees of June 5th, 1848, which together con-
tain the contract between the canal company, the State and
the bondholders of 1844.   Certainly no right to such a sale
can be enforced until it appears that the *cestuis que trustent*
can derive nothing on account of their claims from the opera-
tion of the canal by the appellees.   It is manifest that under
the decree we affirmed no sale of the canal by the State,
under the terms demanded by it, can be decreed until "it
shall clearly appear that the said canal cannot be operated
by the said trustees so as to produce revenue with which to
pay the bonded indebtedness."   But the rights of the bond-
holders of 1844 are still more emphatically recognized in the
mortgage which the State accepted from the canal com-
pany, for we find in that instrument the following provision :
"Subject, nevertheless, to all and singular the liens and
pledges created by the provisions of the Act of 1844,   *
*   *   which said liens and pledges are in nowise to be
*lessened, impaired or interfered* with by this deed or by any-
thing herein contained."   Assuming, then, that the conten-
tion of the State is correct, namely, that the appellees repre-
senting the bonds of 1844 have a lien only on the net rev-
enue and tolls, and have no claim whatever by virtue of
said bonds on the proceeds of sale of the canal, its property
and franchises, it would necessarily follow, unless the canal
is worthless and cannot be operated to any advantage for
said bondholders, that a sale would not only impair and
lessen their lien, but would absolutely destroy it.   But so
far from the canal being in such a hopeless condition, we
think enough can be found in the record before us to demon-
strate that under its present management by the officers ap-
pointed by the Court, and who are under its control and
supervision, the business, as well as the earning capacity of
the property, has been largely increased.   Notwithstanding
the fact that the appellees, after restoring the property to a
condition for earning revenue, had to build up the business
and win back the traffic which had been diverted to other

routes of transportation, they appear to have met with suc-
cess.    For during the few months of the year 1891, during
which the canal was in working condition, there were car-
ried by it 50,533.14 tons.    The next year, although there
was a scarcity of boats, over 250,000 tons were carried.
And in 1893 the tonnage arose to 336,295, which has not
been equalled during the past ten years.   Under these circum-
stances we are not disposed, even if we had the power, to de-
cree a sale at this time, and thereby destroy the only source
from which, as contended by the State, the bonds of 1844, or
any part of them, can ever be paid, and at the same time, per-
haps, deprive the public of one of the means of cheap transpor-
tation of coal and farm products which the canal now affords.
For it will be remembered that the State had been careful,
in order to protect itself and its citizens, as well as those who
should advance their money to complete the work, to pro-
vide in the charter granted to the company " that the said
canal and the works to be erected thereon in virtue of this
Act, when completed, shall forever thereafter be esteemed
and taken to be navigable as a public highway."    When,
therefore, it appears, and not till then, that the property can-
not be operated so as to produce revenue applicable to the
payment of the bonded indebtedness of the company, then,
under the provisions of the decree affirmed by this Court,
the Court may be asked to decree a sale under the State's
mortgage.    Until that time, in other words, until it " clearly
appears " that the liens of the appellees are valueless and can
therefore neither be lessened nor impaired, a sale under the
conditions demanded by the State, as was said in 73 Md.,
*State* v. *Brown*, can be supported upon no ground, either
legal or equitable.    We have already indicated our opinion
that it has not yet been made clearly to appear that the
said lien of appellees has become valueless ; and, therefore,
it would follow that no such decree of sale would be valid,
because neither the State, acting by its officers, the Courts,
nor through the Legislature, can destroy or impair liens
which exist by virtue of contract.

We have thus far assumed, as contended by the State, that the appellees have no claim upon the *corpus* of the canal or the proceeds of its sale, in case a sale should be ordered, but that the only source from which they can look for repayment of the bonds of 1844 is from net revenue and tolls. This question has been during this term most ably and elaborately argued. But, inasmuch as we have come to the conclusion that there can be no sale at present, under existing circumstances, the question as to the distribution of the proceeds of such sale, ceases to have that commanding importance which would otherwise attach to it. We think, however, there cannot be any doubt as to the correctness of the views upon this question expressed by JUDGE ALVEY, former Chief Justice of this Court, while presiding in the Circuit Court for Washington County in the former trial of this case. We can add nothing to the force and fullness of the convincing arguments so cogently presented by him in that able opinion, and upon the views therein expressed we are content to rest our conclusion that the lien of the bondholders of 1844 is limited to the net revenue and tolls of the canal. *Opinion of Alvey, C. J.*, Appendix 73 Md. 590–600.

According to the provisions of the decree the amount expended by the appellees in restoring the canal, to-wit: the sum of $430,764, with interest, is to be paid from the tolls and revenue, after paying certain other expenses as set forth in the decree. This decree stands affirmed by this Court, and is the law of this case, so far as applicable. If we had come to the conclusion to decree a sale upon the conditions asked by the State, and the source, namely, the revenue, from which this sum is decreed to be paid, had been thus destroyed, another question, not now before us, might be presented.

During the argument at this term in reference to the question of priority of liens, some reference was made to what are known as the labor claims "for labor and supplies furnished the company before the freshet of 1889 to

keep the canal in repair and operation." These claims, however, were not before the Circuit Court for Washington County at the time of the former appeal, and they are not before us now. Hence no definite determination can be made in regard to them.

To a contract such as that proposed to be made by the appellees with the Chesapeake and Ohio Transportation Company, and approved by the Court .below, we can see no valid objection. The rights of both parties, as well as those of the public in relation to the canal appear to be carefully guarded. By means of this contract the appellees will secure a guaranteed fixed income of not less than $100,000, and an increased number of boats, thus increasing facilities for transportation, and providing means for increasing the revenue and tolls. Without further reciting the various provisions of the contract, we agree with the learned Judge below that there is no good reason why a contract similar to the one proposed should not be authorized by the Court. It provides that "nothing therein shall be taken to give the Transportation company any exclusive rights whatever on the said canal, or to prevent the appellees from making with any other person or corporation a contract or contracts similar to the one proposed in whole or in part, or that the use of electrical power, if it be found practicable, shall interfere with the use of animals or steam by individual boat owners."

It will be seen that we are of opinion, first, that under the circumstances disclosed by the record the appellant is not now entitled to a decree for sale of the canal, its property and franchises, and that, therefore, the order of the Court below extending the time for operating the canal by the appellees under the order and control of that Court, should be affirmed; second, that the bondholders of 1844 are entitled to payment out of and have a lien only on the net revenue and tolls; third, that although the State has waived its lien on the canal and its revenue and tolls in favor of the labor claims, as they were not before the Circuit Court for

Washington County, nor in any manner passed upon by the order appealed from, we cannot on this appeal dispose of them ; and fourth, that the contract proposed to be made between the appellees and the Transportation company is proper and appropriate to enable the former to operate the canal advantageously.

And in conclusion we may say, as we substantially said in the opinion from which we have already quoted (*State* v. *Brown*, 73 Md. 503), that we have nothing to do with the alleged ulterior purposes of any of the parties to this controversy. We have endeavored to dispose of the questions considered in accordance with what appear to us to be the clearest principles of law, equity and justice. But, if by reason of the conclusion we have reached, the appellant shall be prevented from enforcing its claims by a sale, and if it is thus prevented from destroying the canal as a waterway, it may be some satisfaction to remember that the view we have expressed is in strict accordance with the solemn declaration the State has made, that the canal shall forever be taken and esteemed as a navigable highway. It has, however, been doubted whether the property in question could under any circumstances be sold for enough, so that, after the payment of, all·claims which are conceded to have legal priority over that of the State, there would be anything left to go towards a reduction of its claim of many millions. But whether this be so or not, whether the sale would produce much or nothing towards the paying the State's claim, her contract that the liens of the appellees created by the Act of 1844, should not be lessened, impaired, or interfered with by her under her mortgage, must be recognized and enforced, and her good faith impliedly, at least, pledged for the maintenance of the canal as a waterway by the declaration in the charter she granted that the canal should forever thereafter be esteemed and taken to be a navigable highway, must be maintained at any cost.

*Order affirmed.*

(Decided June 17th, 1896).

BRYAN, BRISCOE and PAGE, JJ., dissented, and BRYAN, J., delivered the following opinion, in which PAGE, J., concurred :

BRYAN, J.   The question which we are called upon to decide cannot be clearly understood without some statement of the previous proceedings in this case.

On the second day of October, eighteen hundred and ninety, the Circuit Court for Washington County, sitting in equity, passed a decree for the sale of the Chesapeake and Ohio Canal.   It was decreed that the sale should embrace all the rights, title and interest of the corporation, to the entire line of the canal ; all its lands, tenements and estates, works and appurtenances, tools, implements and boats, water-rights and franchises.   All the parties in interest were before the Court, and the decree bound all their rights in the subject-matter of litigation.   It was provided in the decree that its execution should be stayed and suspended on certain conditions, which will hereafter be more particularly considered.   The parties to the suit in which the decree was passed were the trustees of the holders of the bonds issued under the Act of 1844 ; the trustees of the bonds issued under the Act of 1878 ; the State of Maryland ; the Chesapeake and Ohio Canal Company ; Bernard Carter, executor of the last will and testament of Charles H. Carter, deceased ; and certain bondholders whose rights are not now in question.   Appeals were taken from the decree severally by the State of Maryland, the canal company and Mr. Carter, but by none of the other parties to the suit.   The decree of the Circuit Court was affirmed by this Court.   The case is reported in 73 Maryland, 484.   The clauses in the decree suspending its execution authorized the delivery of the canal and all its property to trustees of the bonds issued under the Act of 1844, provided that thay should take up and bring into Court all the outstanding bonds issued under the Act of 1878 ; and that they should put the canal in good repair and condition throughout its entire length, and do certain

other things which it is not important now to mention. Upon the performance of these conditions the trustees of the bonds of 1844 were to be subrogated to the place of the trustees of the bonds of 1878, with all their rights and remedies, and were to have full possession and control of the canal, and to exercise all the franchises of the corporation. It was further decreed as follows: "Sixth. That if at the end of four years from the first day of May next, there shall not have been tolls and revenues derived from the said canal, and the property and rights appurtenant thereto (over and above the amount necessary to pay current operative expenses and to keep the canal in repair), to liquidate and discharge the amount of the cost of repairing and restoring the canal to a working condition from its present broken condition, and the amount of money required to pay expenses and compensation to the receivers, and to pay any amount that may be determined to be a preferred lien on such tolls and revenues for labor and supplies furnished to the canal company, such failure in the tolls and revenues shall be regarded as evidence conclusive (unless the time be extended by the Court for good and sufficient cause shown) that the said canal cannot be operated so as to produce revenue with which to pay the bonded indebtedness of the said canal company; and further, whenever it shall clearly appear that the said canal cannot be operated by the said trustees so as to produce revenue with which to pay the bonded indebtedness of said company, the right and power is hereby reserved to this Court to order and direct the execution of the foregoing decree of sale."

The 1844 trustees complied with the required conditions and entered into possession of the canal, made necessary repairs and have operated it ever since. In January, 1894, these trustees filed a petition in the Circuit Court for Washington County, praying that the period for which the execution of the decree was stayed should be extended for an additional term of ten years. After answer by the State in

opposition to the proposed extension, the Court ordered that the execution of the decree should be stayed for a period of six years from the first day of May, eighteen hundred and ninety-five.    The State appealed from this order, and the case was argued at the last October term of this Court.    It was considered that before a sale was made it was proper to settle the priorities of the different parties in the distribution of the proceeds.    And as some of the counsel in the cause desired to argue this question more fully, the Court granted the request, and ordered it to be reargued at the present term.    The argument took a much wider range than we anticipated, tending (if we correctly understood the counsel for the appellees) to impeach the validity of the decree for the sale.    This decree was passed by a Court of competent jurisdiction, with all the parties in interest represented by counsel before it, and was affirmed by this Court after full and elaborate argument and upon great deliberation.    It has all the sanction which the law can give to any decree, and it cannot now be disturbed.    But, as the matters involved are of great public interest, we have thought it well to give our views upon the whole question.

In April, eighteen hundred and thirty-five, the canal corportion executed a mortgage to the State of Maryland.    It embraced the following property :    " All and singular, the lands and tenements, capital stock, estates and securities, goods and chattels, property and rights now or at any time hereafter to be acquired, and the net tolls and revenues of said company."    In May, eighteen hundred and thirty-nine, it executed another mortgage and described the mortgaged property in the same terms.    By the Act of 1844, chapter 281, the canal company was authorized and empowered to borrow a sum of money not exceeding one million seven hundred thousand dollars, and to execute preferred liens on its revenues in the manner mentioned in the Act for the purpose of securing the loan with interest.    The lien on the revenues was limited by the second section of the Act, wherein it was enacted " that the president and directors of

said company shall from time to time, and at all times here-
after, have the privilege and authority to use and apply such
portion of said revenues and tolls as in their opinion may
be necessary to put and keep the said canal in good condi-
tion and repair for transportation, provide the requisite sup-
ply of water and pay the salaries of officers and agents, and
the current expenses of the said company." By the fourth
section the liens of the State on the revenues were " waived,
deferred and postponed " in favor of the bonds to be issued,
so as to make them preferred liens on the revenues accord-
ing to the provisions of the second section. By the sixth
section the canal company was authorized to execute any
deed, mortgage or other instrument of writing necessary or
expedient to give the fullest effect to these provisions. And
by the seventh section the canal company was required
to execute to the State a further mortgage on the said canal,
its lands, tolls and revenues," subject to the liens above
mentioned. Mortgages were executed according to the
tenor and effect of the requirements of the Act. The dif-
ference is very striking between the mortgages to the State,
and the mortgage to secure the bonds of 1844. The canal
itself, and all its property, as well as its tolls and revenues
had been previously mortgaged to the State. While the
lien of the bondholder is only on the revenues, subject to
deductions from them for repairs, supply of water, salaries
and current expenses. In other words, only on the " sur-
plus net revenues aforesaid," as they are styled in the fifth
section of the act. And the revenue was liable to be still
further reduced upon other contingencies which were alto-
gether probable. The Act of 1843, chapter 124, gave the
canal company power to borrow money for the objects of
its charter, and to pledge its property and revenues for the
payment of the loan ; provided that the prior rights and
liens of the State should not be impaired, which had been
acquired under mortgages previously executed. This Court
in the canal case (32 *Maryland*, 501) decided that this grant
embraced the power to construct the canal, repair it and keep

it in order ; and that before the liens of the bondholders of 1844 should be paid the canal company had " power to use and apply its revenues in such way as to preserve the existence of the canal, and keep it a living operative work, capable of earning tolls and revenues, and subserving the great public purposes for which its charter was granted." We quote the language of the Court on page 535. And in speaking further of the position that the lien of these bondholders was prior to the claims for repairs they say on pages 538 and 539 : " They took security only upon expected tolls and revenues, and only on so much of them as might remain after repairs and other expenses were first provided for. There is certainly no equity in the pretensions they now assert. But the conclusive answer to their whole complaint is, that by the face of their bonds they were referred to the Act of Assembly, a public statute of a State, under which they professed to be issued, and are in law chargeable with knowledge of all its provisions and of the true construction to be placed upon them by the Courts. And besides this, the mortgage taken for their benefit recites the proviso in the second section of this Act, as well as all its other provisions, and devotes the mortgaged tolls and revenues to their security only, ' after payment of the debts now existing and that may hereafter be contracted and in arrear for repairs on the canal and officers' salaries.' " It was in that case clearly decided that if the receipts from tolls and revenues should be insufficient to make repairs the canal company had the right to issue bonds for the purpose of obtaining the necessary funds, and to pledge its after accruing revenues in preference to a pre-existing lien upon them. Now a lien on revenues subject to regular and stated deductions of large amounts, and liable to others of an indefinite aggregate on contingencies which would probably occur cannot be put in the same category with a fixed and definite mortgage on the canal and all its property. The difference between the interests conveyed is enormous. The meaning of the fourth section of the Act was that the State

should not take the revenues so as to defeat the limited right to them which was pledged to these bondholders, but nothing is said about waiving its lien on the lands and other property of the canal. It was intended that the State should agree that these bondholders should have these net revenues as far as they might have them under the law; but its agreement extended no farther.

The language of the seventh section requiring a mortgage to the State "*of the canal, its lands, tolls and revenues*" shows that the Legislature, by using a distinctly different phraseology, intended to designate a distinctly different interest from that conveyed to these bondholders.

By the Act of 1878, chapter 58, the Legislature authorized the issue of bonds which were intended to have priority over the liens of the State. It was enacted that they should be secured by a mortgage of the "tolls and revenues and other property, land, water-rights and franchises" of the canal company. By the third section of the Act it is declared that the said bonds and the mortgage are "liens upon the property, tolls and revenues of the Chesapeake and Ohio Canal Company, to be held and enjoyed in preference to any rights or liens which the State of Maryland may have in or upon the said property, tolls and revenues of the said Chesapeake and Ohio Canal Company, until the said bonds provided to be issued under this Act, and coupons thereon, according to the legal obligations thereof against said company, are wholly paid and satisfied." The language is in strong contrast with that used in the Act of 1844. It is morally impossible to suppose that the Legislature did not intend to convey totally different meanings by expressions so widely dissimilar. When this case was in the Circuit Court before the decree for sale of the canal was passed, the trustees for the bondholders under the Act of 1844 filed a petition praying that there should be a reference to an auditor to report on the priority of the liens on the canal. The case was not so referred, but the learned Judge who was presiding delivered a most able and exhaustive opinion,

in which he held that these trustees had no lien on the *corpus* of the canal.   This opinion is published in the appendix to 73 Maryland.   It was because the only security for the payment of the bonds of 1844 depended on the condition of the canal to earn revenue that the Court inserted in the decree for sale the provisions for suspending its execution.

It is stated in the appellees' brief that the grant of all the tolls and revenues carries the entire beneficial ownership. It is also stated " that the right to all the rents and profits of land, or the right to the whole revenue from it, or the right to the whole interest or dividends derivable from personal property, necessarily includes all beneficial interest of every kind which can exist in such property, and for the same reason that when to one has been granted the right to have all the revenues derivable from an estate or property, there is no beneficial interest left in that property for any one else."   The authorities cited to sustain these positions will not be questioned.   But there is a vast difference between a grant of all the revenues and a grant of the kind authorized by the Act of 1844 ; a grant of revenues from which the grantor makes great deductions, some of them occurring at stated intervals and others liable to occur in not improbable contingencies to such an amount as might extinguish them altogether.   In the most favorable view which can be taken of these revenues they are merely " surplus net revenues," and they are so styled in the Act of Assembly.   It is not held anywhere that a grant of net revenues is a grant of the property itself.   A conveyance of land to a trustee in trust to permit some other person to take the rents and profits vests the entire legal estate in the pernor of the profits ; but a conveyance to a trustee to pay some other person the *net* rents and profits leaves the entire legal estate in the trustee and imposes on him the duty to collect the rents and profits and pay over the net amount, after deducting expenses.   The reason is that in the first instance the *cestui que trust* (the beneficiary) has the entire interest ;

while in the second he is entitled only to the profits after the trustee has deducted the expenditures which he has made.

Much reliance was placed on *South Eastern Railway* v. *Jortin*, 6 House of Lords cases, 425. The decision in that case depended on the construction of a number of Acts of Parliament. The Folkstone Harbor Company obtained a loan of ten thousand pounds from the Exchequer Loan Commissioners and executed an indenture which, after reciting certain Acts of Parliament, declared that the company, " in pursuance of the provisions of the Folkestone Harbor Acts, assigned all and singular the rates, duties and receipts whatsoever, then or hereafter to become payable by virtue of the said Acts, and the right, title and interest of the company in and to the same, and all freehold and leasehold messuages, lands, tenements and hereditaments belonging to the said company, according to the nature and quality of the same premises respectively, but subject to the proviso for redemption thereinafter contained." Before the making of this loan the previous creditors and mortgagees of the Harbor company had executed an agreement in writing that any mortgage or other security which should be taken by the Loan Commissioners on the rates, duties and receipts of the Harbor company to secure the payment of the loan of ten thousand pounds should have priority over the respective securities then held or thereafter to be held by them, the said creditors and mortgagees, in the following manner, that is to say, that in the first place the commissioners should be paid annually out of the rates, duties and receipts interest on the loan ; in the next place that the said creditors should be paid their interest out of such rates, duties and receipts ; and after such payment of interest the surplus of said rates, duties and receipts should be applied to the payment of the ten thousand pounds, in preference to and with priority over all claims and demands whatsoever which the said creditors and mortgagees, or either of them, might have on the said rates, duties and receipts. The interest on the

loan having fallen many years in arrear the commissioners sold the tolls, rates, receipts, freehold hereditaments, &c., to trustees for the South Eastern Railway Company. Mrs. Jortin, one of the creditors, claimed that she was entitled to a charge on the Folkestone Harbor and the buildings belonging to it. The principal question was whether the commissioners had power to sell the property. The House of Lords decided that by virtue of numerous Acts of Parliament (especially 1 and 2 William IV, chapter 24, section 21), the commissioners had the power to sell and convey an unencumbered title to the purchaser. They decided further, that Mrs. Jortin and the other creditors must assert their claims against the proceeds in the hands of the commissioners and not against the property which had been sold. The Lord Chancellor said in his opinion : " The other mortgagees will still have all which they contracted for ; that is, a right to be paid their interest before anything is paid to the commissioners in discharge of their principal. This right, however, is one which they can enforce only against the commissioners who have in their hands the proceeds of the sale." We do not find anything in this decision contrary to what we have said. The appellees also cited *Ketchum* v. *St. Louis*, 101 U. S. Supreme Court, 306. The State of Missouri had the first mortgage on the property franchises and income of the Pacific Railroad Company of Missouri. By the Act of 1865, the Legislature of Missouri authorized the County Court of St. Louis County to issue seven hundred county bonds of a thousand dollars each and loan them to the Pacific Railroad Company for the completion of its road. The second section of the Act was as follows : " Sect. 2. The fund commissioner of the Pacific Railroad, or such person as may at any time hereafter have the custody of the funds of said railroad company, shall, every month after said bonds are issued, pay into the county treasury of St. Louis County, out of the earnings of said Pacific Railroad, $4,000, and $1,000, additional in each month of December, to meet the interest

on the said seven hundred bonds; said payments to continue until said bonds are paid off by the Pacific Railroad." The property and franchises of the road were sold under a subsequent mortgage without prejudice to the lien claim of St. Louis County. It was held that the county of St. Louis had an equitable lien on the earnings of the railroad which was enforceable on the railroad property and franchises, and was paramount to any mortgage or lien thereon. We must take notice of the fact that the office of fund commissioner was established by statute, and that it was the duty of this officer to take possession of the *gross earnings of the road from every source*—101 *U. S. R.* p. 308. The statute of 1865 was therefore a specific appropriation of these gross earnings to the payment of these bonds. This appropriation was made upon valuable consideration by the contract of all parties who were at the time interested in the property. We think that nothing more need be said to show the great difference between gross earnings and surplus net earning; between the whole beneficial interest and the fractional part of such interest pledged by the Act of 1844. The Central Ohio Railroad Company issued its bonds containing this stipulation: " For the punctual payment of the interest and principal of this obligation, and others of like tenor, issued or to be issued, in preference to the payment of the dividends on the capital stock of said Central Ohio Railroad Company, the income arising from their road, and its appurtenances, is hereby specificially pledged." It was argued in this Court that these bonds were " (as between the railroad company and the holders), an equitable lien on the whole income or revenues of the road," and " that it was a pledge of *all the income or revenues* of the road, amounting in equity to a pledge of the road itself, and creating, therefore, an equitable mortgage on the road, its franchises and revenues;" appellees argument in *Garrett* v. *May*, at 185 and 186 pages of 19 Maryland. The appellant argued that " The word *income*, here, means *net income* from the

road and its appurtenances." *Ibidem*, page 194. The
question was whether the railroad company could execute
its third mortgage, which would have priority over these
income bonds. This Court held that it had such right. It
will be seen that the execution of this mortgage conferred
a power to sell the railroad, and in this way entirely defeat
the income bonds. It was shown in the Canal case (32
Maryland) that the bondholders of 1844 took security
only on "expected tolls and revenues, and only on so much
of them as might remain after repairs and other expenses
were first provided for." And even this security was sub-
ject to the right of the Canal company to create other
debts for repairs and make pledges of its future revenues
which would have priority over it. It was also taken in
subordination to the existing rights of the State upon all
the property of the canal company, secured by mortgages,
under which, in case of default, it might be sold, and an
unemcumbered title conyeyed to the purchaser. And the
lien of the State on the canal, its lands and chattels, has
never been waived in favor of these bondholders.

After the Court had delivered an opinion stating that a
decree for sale would be passed, these trustees filed a
petition praying that possession of the canal should be
delivered to them, and stating that if it was delivered to
them they could restore it as a waterway and operate it
so as to derive tolls and revenues sufficient to pay the
principal and interest of the bonds of 1878 and of 1844;
and they prayed that in the decree for sale there might be a
provision for a postponement of it. This petition was
vigorously resisted by the State. As has been already
stated, the Court granted a suspension of the sale on cer-
tain terms. The opinion of the learned Court shows very
distinctly the grounds of its action. We quote a passage
from it: "To prevent this sale, and to preserve the only
security to which the bondholders under the Act of 1844
are entitled, their trustees under the mortgage come in and
pray to be allowed to take possession of the canal, and to

repair and operate it, at their own costs, depending alone
for reimbursement. of the outlay, upon such revenues. as
they may be able to realize from the operation of the work;
and to that end they pray that they may be allowed to
redeem the bonds issued under the Act of 1878, and be
subrogated to the rights of the holders thereof, under that
Act.    Can they be denied this right?    I think not."    The
Court had already stated in its opinion of September the
first, 1890, that on account of the ruinous condition of
the canal, it could not be restored with any reasonable
prospect that it could be made to produce revenue applica-
ble to its large bonded indebtedness ; and saying :    " But
all must concede, that if the canal is to be sold, no possible
good can result from delay.    The condition of the work is
constantly growing worse, and there is no reasonable pros-
pect of an enhanced price being obtained by any delay that
may occur.    On the contrary, any considerable delay will
most certainly depreciate the saleable value of the work."
Among the conditions on which the sale was postponed are
the following :    " Third.    That the said trustees, acting
under the said mortgage of the 5th of June, 1848, shall by
the first day of May next, 1891, at their own cost and
expense, to be reimbursed to them, as hereinafter directed,
have put in good repair and condition the entire canal from
one terminus thereof to the other, so that it be fit for, and
capable of, safe transportation thereon, and that upon so
restoring said canal to a state of good repair and condi-
tion, the said trustees shall proceed to operate the same as
a public waterway, with all the rights, and subject to all
the conditions and limitations, granted and prescribed by the
charter of said company ; and the said trustees shall keep
said canal in good repair and condition, and continue to
operate the same, save and except when such operation
may be suspended by the action of causes against the
effect of which, prudence and due care in management will
not provide.

And the tolls and revenues received or derived from the

use and operation of said canal as a public waterway, and from the property and rights of the canal company, shall be applied by the said trustees as follows:    First. To pay all current and ordinary expenses incurred in operating the said canal, and for keeping the same in good working repair.    Second. To pay and reimburse the said trustees the amount of money brought in by them, with which to pay the expenses incurred by the receivers, and their compensation, with interest thereon.    Third. To pay and reimburse to said trustees the amount expended by them in restoring the said canal to good working order from its present waste and broken condition, with interest thereon.    Fourth. To pay and reimburse said trustees any amount that they may be required to pay, as constituting a superior lien on the tolls and revenues of said canal company to that of the bonds issued under said Act of 1844, ch. 281, for labor and supplies furnished to the said canal company, while said canal was operated and controlled by said company, with interest on the amount so paid.    Fifth. To pay the interest that has accrued and may accrue due on the bonds issued under the Act of 1878, ch. 58, and then the principal of said bonds.    And Sixth. To pay the interest that has accrued and that may accrue due on the bonds issued under the Act of 1844, ch. 281, and then the principal of said bonds.    And upon the full payment these of last-mentioned bonds the possession and control of said trustees shall cease and terminate."

The postponement was to continue until the first day of May, 1895.    That time has long since passed and the experiment, which the Court considered a hazardous one, has utterly failed. The petition by the trustees now before us, filed in January, 1894, for the purpose of obtaining a further postponement of the sale, contains the following statement : " These trustees have borrowed for the purpose of making said repairs $435,163.34.    Their receipts from net tolls, rents and other sources to December 1st, 1893, have been $270,-970.73.    Their expenditures have been for the repair of

the canal and its works, under the orders of the Courts, $430,764.43 ; for other accounts, $250,327.17.    This statement does not include $15,000 borrowed and paid as the compensation of the receivers of this Court and the Supreme Court of the District of Columbia."    There are hopes and expectations on the part of the trustees for greater success in the future.    But these hopes have signally failed in the past.    The projected enterprise will be subject to all the uncertainties of the future.    The adjudicated right of the State for a sale has already been postponed for nearly six years ; during this interval large arrears of interest have accumulated, which will never be paid.    For a long series of years the canal company has been unable to produce more than a small amount of revenue ; in the meantime the bonded debt of the State is accumulating, with the prospect of payment becoming more unfavorable every year.    Unless its rights are to be entirely sacrified there ought to be some definite limit to the delay in obtaining the remedy which the law has given it.    The bondholders of 1844 have made the experiment which they desired to make, upon conditions offered to them by the Court, and made a part of its solemn judgment.    By the sixth article of the suspending provision it was decreed that if by the first day of May, eighteen hundred and ninety-five, the tolls and revenues should not be sufficient to pay the amounts mentioned in the article, " such failure in the tolls and revenues shall be regarded as evidence conclusive (unless the time be extended by the Court for good and sufficient cause shown) that the said canal cannot be operated so as to produce revenue with which to pay the bonded indebtedness of the said canal company."    This failure has occurred in the tolls and revenues.    And the result stipulated and decreed ought now to follow.    The right of a mortgagee to sell the mortgagor's property on default is obtained by a solemn contract, which the law is bound to protect.    If the enjoyment of this right is delayed now, it may be delayed again and again.    Repeated delays will greatly impair, and

may destroy its value. And the right of precedence belonging to a prior mortgagee will be subordinated to the inferior right of a subsequent lienor.

The result of our opinion is that the decree for sale passed by the Circuit Court and affirmed by this Court ought to be executed without further delay. And that the bonds of 1878 have the first lien on the proceeds of sale; the claims of the State under its mortgages have the second, and the bonds of 1844 have the third. As the Legislature at its last session enacted that certain labor claims should be paid out of the amount coming to the State, these claims will be paid according to the directions of these statutes. As it was distinctly decreed that the trustees should repair the canal at their own cost and expense, and look to the tolls and revenues for repayment of the amount expended; and as the trustees prosecuted the work on this understanding, the expenses which they have incurred will not be paid out of the proceeds of sale.

(Filed June 17th, 1896).

McSHERRY, C. J., delivered the following opinion:

I assented to an affirmance of the order appealed from for the reasons I am now about to set forth. With one of the views expressed in both the opinions that have been filed I find myself wholly unable to agree; and upon another question I go much farther than the Judges who concurred in the opinion prepared by JUDGE FOWLER. With the most profound deference and respect for the judgment of all my brothers, I am, after a patient and thorough examination of the whole case, driven to a conclusion on that branch of it relating to the priorities of the liens on the canal which is diametrically opposite to the determination reached by all the other Judges who sat in the case; and this, too, in spite of a strong inclination on my part to yield my own views to their better and much more reliable judgment. As every suitor is entitled to have each Judge who hears his case investigate and pass upon it to the utmost of his ability, I feel no reluctance in stating what the convictions resulting from

my investigations are, and in setting forth, somewhat at length, the reasons which led me where I stand. That I may be in error, and that my brothers may be right upon the question of priorities, is entirely likely ; but as neither the arguments at the bar nor the discussions in the consultation room, nor my own reflections, have enabled me to see, to my satisfaction, that I am wrong, I feel bound to adhere to my own conclusions, arrived at after much thought and deliberation, rather than to tacitly acquiesce in a determination which I cannot persuade myself is right.

If the bonds issued under the Act of eighteen hundred and forty-four, chapter two hundred and eighty-one, and secured by the mortgage of June the fifth, eighteen hundred and forty-eight, are entitled to a priority over the liens held by the State of Maryland, then a decree directing the sale of the canal, without making provision for the payment of those bonds, as a preferred lien, would obviously be erroneous ; and as both opinions hold that those bonds are subordinate to the mortgages executed to the State, and as I entertain the directly opposite view, I could not concur in a reversal of the order appealed from without consenting to a sale of the canal free and discharged of the very lien which, as between the State and the bondholders of eighteen hundred and forty-four, I believe to be the paramount lien ; and therefore the lien entitled at law and in equity to be first paid and satisfied, before the State could justly claim a dollar. Consequently, but not for that reason only, I united with Judge Fowler, Judge Roberts and Judge Russum in affirming the order extending the time allowed the trustees of the bondholders of eighteen hundred and forty-four to hold possession of and to operate the canal. To have done otherwise would have resulted not only in dispossessing the trustees, but in stripping them of that which, in my estimation, is their just priority.

Are, then, the bonds issued under the Act of 1844, ch. 281, a lien on the entire canal and entitled to payment, in the event of a sale, in preference to the claims held by the State of Maryland under her mortgages ?

To intelligently answer this inquiry it is absolutely essential, it seems to me, that we should look back briefly into the history of the canal from its origin ; know the powers the company possessed under its charter, appreciate the struggles encountered in the progress of its construction, understand its financial condition before and at the time the bonds were issued, and learn the expectations and hopes shared by its friends and projectors as to the ultimate benefits which its completion to Cumberland, it was confidently predicted, would realize.   In a word, we ought to consult the contemporaneous understanding of all the parties to the transaction, as evidenced by their acts, in seeking for the meaning of the contracts under which the bonds were issued.   Informed by these means of those things which more than half a century ago influenced the conduct and shaped the judgment of the individuals who, as representatives of the State and as the officers of the canal company, engaged in consummating the contracts about to be considered ; a safer and surer guide for interpreting the meaning of those contracts will be afforded than there can possibly be obtained when, unaided by "foreign circumstances," their naked language written more than fifty years ago, alone is looked to and construed.

It may not be uninteresting to observe at the outset that the project of a chain of internal improvements by way of the Potomac River and across the mountains to the navigable waters which flow into the Ohio originated with General Washington, probably anterior to seventeen hundred and seventy-four.   At all events, he obtained from the Legislature of Virginia in that year a law authorizing such persons as were disposed to undertake the scheme to open the Potomac so as to render it navigable from tide-water to Wills' Creek ; and, notwithstanding the Legislature of Maryland interposed objections to a concurrence in the law, some progress had been made, when the battle of Lexington turned the attention of all the colonists to the struggle which finally resulted in our independence.   After the revo-

lutionary contest had ended General Washington again took up the subject of the improvement of the navigation of the Potomac up the North branch or to Fort Cumberland, and at his suggestion deputies were appointed by the Legislatures of Virginia and Maryland in seventeen hundred and eighty-four to confer and agree upon the provisions of a bill having that object in view.   Such a bill was accordingly prepared and was adopted by the Legislature of Virginia in October, seventeen hundred and eighty-four, and by the Legislature of Maryland at the November session of the same year, and on the seventeenth of May following the Potomac Company was duly organized.   By the tenth section of its charter it was provided " that the said river and the works to be erected thereon, in virtue of this Act, when completed, shall forever thereafter be esteemed and taken to be navigable as a public highway, free for the transportation of all goods, commodities or produce whatsoever, on payment of the tolls imposed by this Act.   And this language, changing the word " river " into " canal," was incorporated in the fourteenth section of the charter of the Chesapeake and Ohio Canal Company.   General Washington became the Potomac Company's first president, and continued to hold that position until called to fill the exalted station of President of the United States.   The time limited in the acts of incorporation for the completion of the work having expired and the work not having been finished, various extensions were granted by the Legislatures of the two States that had chartered the company, until finally, in eighteen hundred and twenty, after Maryland had passed five and Virginia ten different Acts extending the period for constructing the work, and after thirty-seven years of labor and experience and the expenditure of over a half million of dollars, it became evident that the river could not be so improved as to answer the purpose intended.   But a strong sentiment as to the feasibility of a continuous canal to the Ohio had grown up, and was fortified by the report of the civil engineer of Virginia ; and the project was commended

in a report of a committee of Congress in May eighteen
hundred and twenty-two.    As a result of this sentiment
and the impetus it had received from the sources just named,
public meetings were held in various places and delegates
were selected from Virginia, Maryland, Pennsylvania and
the District of Columbia to assemble in convention.    The
convention met and drafted memorials to the Legislatures of
the States named and to the Congress of the United States,
seeking an incorporation of a company for the construction
of a canal from the tide-water of the Potomac by way of
Cumberland to the mouth of Savage River, and ultimately
to the navigable waters of the Monongahela or Ohio Rivers,
and asking the assistance of these States and of Congress
in providing the requisite means to construct the work.    On
the twenty-seventh of January, eighteen hundred and twenty-
four, an Act incorporating the Chesapeake and Ohio Canal
Company was passed by the Legislature of Virginia, but its
vitality was made to depend upon the assent of the Legisla-
tures of Maryland and Pennsylvania and the Congress of
the United States.    On the thirty-first of January, eighteen
hundred and twenty-five, the Legislature of Maryland passed
an Act reciting and setting forth in full the Virginia Act
and confirming it, but at the same time declaring that it was
not intended by the Legislature of Maryland to deny to
Congress the constitutional power to legislate on the sub-
ject of roads and canals.    On the third of March, eighteen
hundred and twenty-five, the Congress of the United States
ratified and confirmed the Act of the Virginia Legislature.
The application to Pennsylvania was twice rejected, but
finally on February the ninth, eighteen hundred and twenty-
six, a confirmatory Act was passed.    Various other Acts
were procured numbering sixteen with those already men-
tioned.    The legislative history of the company is traced
step by step in the lucid and exhaustive opinion delivered
by CHIEF JUSTICE BUCHANAN in *Canal Co.* v. *Railroad Co.*,
4 G. & J. 1.    Thus the Chesapeake and Ohio Canal Com-
pany stood incorporated by three sovereign States and by

the Federal Government—the outgrowth of their concurrent action—and on the fourth day of July, eighteen hundred and twenty-eight, John Quincy Adams, then the Chief Magistrate of the Republic, in the presence of a vast and enthusiastic concourse of citizens, dug the first spadeful of earth from the site located for the channel of the canal.

The capital stock of the company consisted of six millions of dollars, with power of future enlargement, and authority was given to take payment of subscriptions in the certificates of the stock of the Potomac Company, not exceeding the sum of $311,111.11, and in claims held by creditors of that company, not exceeding $175,000, and on the fifteenth day of August, eighteen hundred and twenty-eight, the Potomac Company, by deed duly executed and under authority duly obtained, surrendered to the Chesapeake and Ohio Canal Company its charter and all its property, rights and franchises, and thenceforth ceased to exist as a separate entity. The powers acquired by the Chesapeake and Ohio Canal Company, under its charter and in virtue of the surrender made to it by the Potomac Company, were large and liberal and the duration of its existence was without limit. Its objects were more than merely local in their character, for, besides stimulating the development of the coal fields of Allegany and throwing open a means of transportation for the products of a vast agricultural region, it was, as declared in the preamble to its charter, designed "to establish a connected navigation between the eastern and western waters, so as to extend and multiply the means and facilities of internal commerce and personal intercourse between the two great sections of the United States ; and to interweave more closely all the mutual interests and affections, that are calculated to perfect the vital principle of union." And President Monroe, in his annual message to Congress on December the second, 1823, adverted to the projected measure as one intended to connect "the Atlantic with the western country in a line passing through the seat of the national government," which " would contribute essentially to strengthen the bond of union itself."

With these extensive objects in view and to perfect the organization of this great undertaking, the Legislature of Maryland, at the December session of 1825, passed an Act authorizing a subscription to the company's capital stock to the full amount of stock owned by the State in the Potomac Company, and of the debts due to the State by the same company and in addition a half million of dollars payable in current money.    Under an Act of Congress approved May the twenty-fourth, 1828, the general government subscribed one million of dollars to the capital stock ; and by another Act passed the same day Congress authorized the cities of Washington, Georgetown and Alexandria to subscribe to the stock.    Accordingly Washington City subscribed one million and Georgetown and Alexandria each a quarter of a million of dollars.    Subsequently the general government liquidated the bonds issued by these cities to pay their respective subscriptions, and became in eighteen hundred and thirty-six possessed of their shares of stock. Besides these subscriptions the corporation of Shephardstown took twenty shares of the par value of two thousand dollars, and individuals subscribed for 6,074 shares of the par value of $607,400.    In February, eighteen hundred and thirty-three, the State of Virginia subscribed for two hundred and fifty thousand dollars of the company's stock. On the fourteenth of March, eighteen hundred and thirty-four the State of Maryland subscribed for one hundred and thirty-five thousand dollars of additional stock, payable in five per cent. bonds of the State.    The total stock subscriptions up to this period aggregated $3,984,400, with the controlling interest in the general government and the city of Washington.    Up to June, eighteen hundred and thirty-four, $4,062,991.25 had been expended, and though scrip, supported by pledges of stock, had been resorted to for raising additional funds, the company was without sufficient means to open navigation beyond a point one hundred and seven miles west of Georgetown, and only eighty-six miles of this distance had been actually finished.    Seventy-eight

miles of the work, extending eastward from Cumberland, and covering some of the heaviest sections between George-town and Cumberland, remained untouched. In its straightened condition resort was again had to public meetings, and committees were appointed to memorialize Congress, and the Legislatures of Maryland, Virginia and Pennsylvania, and the corporate authorities of Baltimore City, for the necessary means to complete the work to Cumberland. When it became apparent that aid could be expected from no other quarter, and that the burden of providing for the completion of the canal had fallen on Maryland, her Legislature promptly met the emergency, and on the eighteenth of March, 1835, passed an Act—Acts of 1834, ch. 241— appropriating two millions of dollars for the completion of the canal, that being the estimated amount required to finish the work. This aid was not given as on previous occasions, by way of a subscription to the capital stock, but was put in the form of a *loan* by the State to the company, coupled with a requirement that a mortgage be executed on the whole of the net revenues, lands, property and water-rights of the company to secure the repayment of the loan and the quarterly interest to accrue thereon. On April the twenty-third, 1835, the mortgage was executed. Up to the passage of this Act the total amount invested by the State in the canal was, apart from the sum represented by the Potomac Company's stock and debts, but six hundred and twenty-five thousand dollars, and the whole funded debt of Maryland was something less than two millions of dollars. Her credit was high and the stock issued by her to raise the two millions for the loan was sold by the State Treasurer for $116.40. The aid thus furnished fell far short of completing the work, and consequently, at the next session of the General Assembly, additional help was solicited. After many vicisitudes an Act was passed on May the twenty-eighth, 1836—it being ch. 395 of the Acts of 1835, and known as the eight million bill. It authorized subscriptions to the capital stock of several internal improve-

ment companies, including the Baltimore and Ohio Railroad
Company and the canal company. The amount directed
to be subscribed to the latter was three millions of dollars,
coupled with a requirement that a written instrument should
be given to the State guaranteeing a dividend of six per
cent. after the expiration of three years, to be paid out of
the net profits of the canal and its works. The aid thus
given was in the form of a subscription to the capital stock
and secured to the State from thenceforth, as the majority
stockholder, the control and government of the company.
Owing to the financial embarrassments which then affected
the money markets of Europe and America, and the sus-
pension of specie payments by the New York banks in
May, 1837, quickly followed by the other banks through-
out the country, it was found impossible to float the bonds
of the State at the high premium fixed by the Act of 1835,
and hence, under joint resolutions passed by the Legislature
of 1837, but two million five hundred thousand dollars in
bonds were turned over to the canal company in full of the
three million subscription, and five hundred thousand dollars
of the bonds were retained by the State Treasurer. The bonds
delivered to the canal company in payment of the State's
subscription were hypothecated for loans by the company
and by this means the work on the canal was measurably kept
up. By the Act of 1838, ch. 386, three million two hundred
thousand of five per cent. sterling bonds were authorized to be
issued by the State Treasurer in exchange for the two mil-
lion five hundred thousand dollars of six per cent. certifi-
cates or bonds, delivered to the company under the Act of
1835, and the five hundred thousand dollars of bonds re-
tained by the State Treasurer.

By another Act of the same session, ch. 396, a further
subscription by the State to the capital stock of the com-
pany to the amount of one million three hundred and sev-
enty-five thousand dollars, payable in five per cent. sterling
bonds, was authorized. This Act, like the Act of 1835,
required a guaranty of six per cent. dividends on the stock

subscribed, payable out of the net profits of the work, after the expiration of three years. This was the last subscription ever made to the stock of the canal company. The total amount of all the stock ever subscribed was $8,359,400 and of this aggregate the State of Maryland took and became the owner of five million. At the December session of 1839, another application was made by the company to the Legislature for aid; but without success. In the meantime the financial affairs of the company were growing desperate. The bonds issued by the State to the company, in payment of the State's subscriptions, were disposed of at forced sales; scrip was issued, without any provision being made for its redemption, and was actually received in payment for tolls; by which ruinous methods the company was compelled to submit to heavy sacrifices, and was deprived of much of the available means upon which alone it could rely for keeping the canal in operation. At the extra session of 1841, and at the regular December session of the same year, renewed applications were made to the General Assembly for aid, but without avail, and by the close of the year 1841 there was not a solitary laborer employed between Dam No. 6 and Cumberland, nor was work again resumed until some considerable time after the passage of the Act of 1844, ch. 281, under which were issued the bonds held by the persons for whom the appellees are the trustees; and these are the bonds now claimed to have priority over the liens of the State.

In August, 1843, General James M. Coale was elected president of the canal company, and under his wise, broad and sagacious management the work was completed to Cumberland in October, 1850. At the period of his election the company had reached its lowest depth of depression. It was utterly overwhelmed with difficulties, was without means and without credit; and, in addition to its enormous liabilities to the State, it was beset and borne down with debts and obligations evidenced by scrip, certificates of debt, ordinary bonds and open accounts stated

by the treasurer on October the first, 1843, to aggregate $1,174,566.31. Assistance, though sought in all directions, could be obtained from no quarter whatever, and the company was powerless to extricate itself, and had nothing to depend on to sustain its feeble existence but the small annual revenues derived from tolls and water rents collected between Georgetown and Dam No. 6. At this critical period of its history a special report prepared by General Coale and submitted to the stockholders on November the sixteenth, 1843, suggested the feasibility of procuring legislation from the General Assembly, waiving the State's liens under her mortgages, and authorizing the company to issue its own bonds to the extent of two millions of dollars with preferred liens on the tolls and revenues. It was then estimated that it would require $1,545,000 to complete the canal from Dam No. 6 to Cumberland. I quote from the special report of November 16th, as follows : " In order, however, to give full strength to the credit of the company, so as to enable it to procure the required sum upon fair and advantageous terms, it will be indispensibly necessary to waive the State liens to a much larger amount, so that a broad and tangible basis may be presented for the bonds to rest upon. *  *  *  *  * The better fortified the bonds are, the greater will be their value ; and as no more will be issued than will be necessary to finish the work and pay the interest on the cost thereof, in aid of the nett tolls of the canal, until they become sufficient for the purpose, together with the small outlay for repairs and improvements on the finished portion of the line, it will be the interest of the State to leave a broad margin to the credit of the company. With this view and to provide against all contingencies, we would recommend *a waiver of the State liens* to such amount as may be found necessary for those purposes, not exceeding the sum of two millions of dollars." (Page 15 Report). But the Legislature of 1843 adjourned without acting on this suggestion. It was renewed at the next session, and after a long and arduous struggle led by William Cost Johnson

of Frederick County, in the House of Delegates, the Act
waiving the liens of the State was passed, and under that
Act the canal was ultimately completed to Cumberland.
The Act to which I refer is the Act of 1844, ch. 281, and
it was passed on March the tenth, 1845, the last day of the
session.   Upon its terms and provisions, interpreted in the
light of the events that preceded, surrounded and influenced
its adoption, and upon the terms of the mortgages made in
pursuance of it, turns the question whether the bonds which
it authorized to be issued have a lien that is prior to the
liens held by the State on the canal, or on the proceeds of
a sale of the canal should the canal be sold.   I have sketched
this imperfect outline of some of the events in the canal's
history that the inquirer of to-day might be placed in pos-
session of the facts which were familiar to the persons who
procured this legislation and who made the mortgages to the
State and in behalf of the bondholders ; and being thus
placed that he may look at the question of priorities from
the same standpoint, as nearly as may be, that they occupied.

By the first section of the Act of 1844 the canal company
was authorized and empowered " to borrow or raise upon
the bonds of the said company, with preferred liens on its
revenues as hereinafter mentioned, to secure the payment of
the same and the interest to accrue thereon, such sum or
sums of money as may be required to pay for the comple-
tion of the Chesapeake and Ohio Canal to Cumberland,"
*   *   *   *   *   provided that the whole amount of bonds
authorized to be issued shall not exceed the sum of one
million seven hundred thousand dollars.   The second sec-
tion, after prescribing the denominations of the bonds and
the mode of attestation, provided, " and the said bonds so
issued as aforesaid shall appear on the face of the same to
be preferred liens on the revenues of the company and
*   *   *   *   shall be preferred liens on the revenues and
tolls that may accrue to the said company from the entire
and every part of the canal and its works between George-
town and Cumberland, which are hereby pledged and ap-

propriated to the payment of the same and the interest to accrue thereon ; * * * * provided the president and directors shall have the power to use and apply such portion of said revenues and tolls as in their opinion may be necessary to put and keep the canal in good condition and ·repair for transportation, &c." By the fourth section it was enacted " That the rights and liens of this State upon the revenues of the Chesapeake and Ohio Canal Company shall be held and considered as *waived, deferred and postponed* in favor of the bonds that may be issued under the aforegoing sections, so as to make the said bonds and the interest to accrue thereon *preferred and absolute liens* on said revenues, according to the provisions of the second section of this Act, *until said bonds and interest shall be fully paid."* And by section seven it was provided " That the Chesapeake and Ohio Canal Company shall execute to this State and deliver to the treasurer of the Western Shore of Maryland a further mortgage on the said canal, its lands, tolls and revenues, *subject* to the liens and pledges by the aforegoing provisions of this Act made, created or authorized, as an additional security for the payment of the loan made by this State to the said company under the Act of December session, 1834, ch. 241, and the interest due and in arrear and which hereafter may accrue thereon."

Prior to the year eighteen hundred and forty-five the power of the company to borrow money had been gravely questioned and the validity of its mortgages to the State securing the two million loan had been seriously doubted ; but by an amendment to the charter passed by Virginia on January the twentieth, 1844, confirmed by Maryland on February the eighth of the same year and ratified and assented to by Congress on February the seventh, 1845, all questions and doubts on this subject were finally set at rest.

After the conditions upon which the effectiveness of the Act of 1844, ch. 281, was made to depend had been fully complied with and a contract for the completion of the canal had been executed, the bonds were issued in payment for

the work done as it progressed, and they subsequently found
their way into the hands of the present holders.   But for
these bonds the canal would not, it may fairly be assumed,
have been completed at all, and the State's large interest,
then amounting, with accrued interest added, to nearly
eleven millions of dollars, would, in all probability, have
been lost half a century ago.   Before the bonds were all
issued a mortgage to the State, drawn under the seventh
section of the Act of 1844 was executed.   It bears date
January 6th, 1846, and after reciting the several provisions
of the Act, conveyed in mortgage the lands, tenements,
revenues, tolls and property of the canal to the State, " *Sub-
ject*, nevertheless, to all and singular the liens and pledges
by the provisions of the before mentioned Act of 1844, ch.
281, made, created or authorized, or that have been or may
hereafter be made, created, given or granted by the said
Chesapeake and Ohio Canal Company or the President and
Directors thereof, under or in pursuance of the provisions
of said Act, which said liens and pledges are in no wise to
be *lessened, impaired* or *interfered with* by this deed or by
anything herein contained, and subject also to all the other
provisions of said Act."

The mortgage securing the bonds issued under the Act
of 1844 was executed to named trustees on June 5th, 1848,
and conveyed the revenues and tolls of the entire and every
part of the canal and its works between Georgetown and
Cumberland in fee and in mortgage, to secure the payment
of the interest on the bonds and ultimately the principal of
the bonds themselves.   And it was further provided, that if
the company failed to pay the interest as it fell due and
failed to provide a sinking fund for the redemption of the
bonds at their maturity from any cause, *except a deficiency
of revenue arising from a failure of business without fault
on the part of said company*—the fault to be made to ap-
pear by the grantees—the grantees might demand and take
possession of the canal and appropriate the tolls and revenues
in the manner provided in antecedent clauses.

Md.]        Separate Opinion by McSherry, C. J.

Now, the statutory lien created by the Act of 1844, and reiterated in the mortgage of 1848, was a *preferred* lien on the *revenues and tolls* that might accrue from the *entire and every part* of the canal and its lands between Georgetown and Cumberland ; and *those* revenues and tolls—that is, the whole and entire, and not merely the nett, revenues and tolls—were pledged and appropriated to the payment of the bonds and the interest thereon, though the right was reserved to the company by the second proviso in the second section to apply such portions of these same revenues and tolls as might be necessary to keep the canal in condition for transportation.   The mortgage of 1848 " doth give, grant, bargain, sell and convey " to the named trustees " the revenues and tolls of the entire and every part of the canal and its works between Cumberland and Georgetown." What estate or interest, then, was pledged ; or upon what estate and interest did the lien fasten ?

" It is an establised rule," said LORD CHIEF JUSTICE TEN-TERDEN, "that a devise of the rents and profits is a devise of the land." *Doe, &c.,* v. *Lakeman,* 2 B. & Ad. 42.   And in *Washburn on Real Property,* it is laid down with respect to *grants* that it is not " necessary that the deed should in terms convey the land or thing intended to be granted, if such grant is implied from what is described.   Thus a grant of the rents, issues, and profits of a tract of land is the grant of the land itself.   If the grant be of the uses of and dominion over land, it carries the land itself." Vol. 3, ch. 5, sec. 4, *placitum,* 23.   " A devise of the rents and profits or of the income of lands passes the land itself both at law and in equity ; a rule, it is said, founded on the feudal law, according to which the whole beneficial interest in the land consisted in the right to take the rents and profits." 2 *Jar. on Wills* (5 Am. ed.), 403.   LORD CRANWORTH, in *Blann* v. *Bell,* 2 De G. M. & G. 781.   " But if a man seized of lands in fee, by his deed granted to another the profits of those lands, to have and to hold to him and his heirs, and maketh livery, *secundum forman chartæ,* the whole land itself doth

pass ; for what is the land but the profits thereof ; for thereby vesture, herbage, trees, mines and all whatsoever, parcel of that land doth pass." *Co. on Lit.*, 4 *b*, vol. 1, star page 200. To the same effect, *Johnson* v. *Safe Dep. & T. Co.*, 79 Md. 18 ; *Cassely* v. *Meyer*, 4 Md. 11; *Reed v. Reed*, 9 Mass. 372 ; *Blanchard* v. *Blanchard*, 1 Allen, 225 ; 29 *Am. & Eng. Encyclo. Law*, 404, and the numerous cases collected in note 1. See also *Pollock* v. *The Farmers' Loan & Trust Co.*, 157 U. S. 429, and particularly the opinion of MR. JUSTICE FIELD ; wherein, after quoting from Washburn, Jarman, Coke, Lord Tenterden, Lord Chancellor Hardwicke, and after referring to many adjudged cases, he observes : " Similar adjudications might be repeated almost indefinitely. One may have the reports of the English Courts examined for several centuries without finding a single decision or even a dictum of their Judges in conflict with them." And in the brief of Mr. Joseph H. Choate, filed on the reargument of *Pollock* v. *Trust Co.*, 158 U. S. 601, many authorities to the same point are cited. The case of *Southeastern Ry. Co.* v. *Jortin*, 6 H. L. cases, 424, is strikingly analogous.

Obviously, then, according to this firmly settled and long established doctrine, the pledge, by the statute of 1844 and by the mortgage of 1848, of the whole and entire revenues and tolls, was a pledge or mortgage of that out of which the revenues and tolls issued or were to issue ; that is, the canal, the land, the works, the physical structure ; and as the State waived, deferred and postponed its prior liens to let in this pledge as a preferred and absolute lien, *this* lien took precedence over the others and became, by virtue of the State's own deliberate and solemn act, the first and predominant lien upon the whole and entire canal. The right to the rents and profits of land involves and carries with it *all* the beneficial interest of every kind which can possibly exist in the land ; and hence, when there has been granted to one person *all* the revenues derivable from land, there is, of necessity, no beneficial interest of any kind left in that particular land for any one else. Consequently, when the State with outstand-

ing mortgages on the land, the property and the revenues of
the canal company, with a view of enabling the great work to
be completed, so that the vast amount invested by her in its
construction might yield her treasury some return, unequivo-
cally declared by the Act of 1844 that she thereby waived, de-
ferred and postponed all her rights and liens upon *all* the reve-
nues of the company in favor of the bonds to be issued under
the same Act of Assembly ; and when she further declared
that those bonds should be *preferred* and *absolute* liens on
these same revenues until the bonds and the interest thereon
were *fully paid*, she necessarily and in unmistakable terms
proclaimed that whilst those bonds were unpaid she would
and could have no beneficial interest whatever in, or
right to, the *property* out of which those very revenues, so
pledged, were to issue.   This is inevitably true unless the
grant of the rents and profits of land does not carry the
land.   The seventh section of the Act of 1844 strengthens
this conclusion.  Doubts having arisen as to the validity of the
State's mortgage made in 1835, to secure the two millions
loan under the Act of 1834, ch. 241, as already stated, the
seventh section of the Act of 1844 provided that the canal
company should, as additional security for the payment of
that loan, execute to the State a further "mortgage *on the
said canal, its lands, tolls and revenues, subject* to the liens
and pledges by the aforegoing provisions of this Act made,
created or authorized, &c."   By the terms of this section
the mortgage to the State *on the canal, its lands, tolls and
revenues* was to be *subject* to the liens made, created and
authorized in favor of the bonds of 1844 ; and if the State's
mortgage *on the canal* and *its lands* was to be *subject* to the
lien of these bonds, the lien of the bonds must of necessity
have been considered and intended to be a lien *on the canal
and its lands*, by reason of being the first and preferred lien
on the revenues and tolls that issued and were to issue from
and out of the same canal and its lands.   It was not possible
for the State's mortgage on the canal and its lands to be in-
law or in fact subject to the lien of the bonds, if the lien of

the bonds was not a prior lien on the canal and its lands. This provision of the Act of 1844 is an express declaration that the lien of the State *on the canal and its lands*—on the physical structure as well as on the revenues and tolls—was designed to be *subject*, that is, *subordinate* to the lien of the bonds of 1844 ; but how could the State's mortgage be subject or subordinate to the lien of those bonds as respects the physical structure, if the bonds were not liens on the same physical structure at all, and the State's mortgages were a first and only lien on the canal and its lands apart from the revenues and tolls.    The bare fact that the State's mortgage *on the canal and its lands* is expressly declared to be secondary to the bondholder's lien is equivalent to a declaration that the latter lien is a prior lien on the very things on which the State's mortgage is made a secondary or subordinate lien.    By providing that the pledge made to the State should be subject or subordinate to the pledge made to the bondholders, the State in express terms affirmed that the thing—the property—she claimed a lien on, was already included in an antecedent or prior lien; and being so included, was included by virtue of the language used in the creation of that antecedent lien ; because for one lien to be *subject* to another lien, the latter must, in the nature of things, be *prior* to it and upon the *same property*.    If one lien be upon one piece of property and another lien be upon a different parcel, though both properties be owned by the same individual, neither lien can be said to be subject to the other; but when both are on the same estate or thing and they are not coincident in date or contemporaneous, one *must be subject* to the other.    Had the Legislature designed to distinguish between a lien on the revenues and tolls as a separate thing from that which has been called the *corpus* of the canal, it would assuredly have said that the lien of the State should be subject to the lien of the bondholders *in so far as* the revenues and tolls were concerned, instead of employing the broad and comprehensive language which was used in the second and seventh sections of the Act of 1844.

Whilst it was conceded on behalf of the State that as a general rule the grant of the rents and profits will carry the land out of which they issue, yet, it was insisted that there were exceptions to the doctrine.    It was accordingly contended that whenever it distinctly appears there was no *intention* to grant more than the rents and profits, nothing but the rents and profits will pass.    And it has been further maintained that in the case at bar it was the evident design of the Act of 1844, and of the parties to the contract which its terms contain, to grant no lien to the bondholders except a lien on the revenues and tolls, reserving to the State a separate, distinct and paramount lien on the property out of which those revenues and tolls were to issue.    I admit it has been held that though ordinarily, the devise of the rents and profits will pass the real estate absolutely, yet such construction will not obtain when the intention of the testator appears from the whole will to be different.    *Cooke* v. *Husbands*, 11 Md. 492 ; *Magruder* v. *Peter*, 4 G. & J. 323.    I do not understand these cases to be in conflict with those hereinbefore cited.    The question is one of intention and the grant of the rents and profits is held to be sufficient to carry the estate, because by granting them the intention to convey the estate is manifested unless the instrument making the grant or devise shows a different purpose on the part of the testator, if there be a will, or on the part of the contracting parties, if there be a conveyance or other like instrument to be interpreted.    But I am wholly unable to perceive how it can be maintained that the design of the Act of 1844, and the intention of the parties to the contract, which its provisions embrace, manifest a purpose to restrict the pledge of the revenues and tolls to the revenues and tolls *alone*, and to exclude the property from which those revenues and tolls were to issue.    In a word, I see no reason for holding that the grant of the revenues and tolls was not intended to carry, in accordance with the general rule, the whole beneficial interest and estate of the canal company in the property that was expected to yield the

revenues and tolls that were pledged.    On the contrary, my
reading of the Act of 1844, looking at it as I do in the light
of the " foreign circumstances " (4 G. & J. 152), which may
legitimately be consulted for the purpose of discovering its
real meaning, leads me, in spite of my disinclination to dif-
fer from my brothers, to the fixed conclusion that the pur-
pose of the Act of 1844 was to give a lien to the bond-
holders upon the whole and every part of the canal and not
simply on its revenues and tolls.

By reference to the various reports of the president and
directors of the canal company and the numerous and vol-
uminous documents accompanying them, which though not
printed in the record are by agreement a part of it, the
design that the officers and stockholders of the company
had in view in seeking the passage of the Act of 1844, and
the sense in which these officers and these stockholders,
including the State herself as the holder of a majority of the
issued shares, understood its terms after its passage, will, I
think, clearly appear.    In the special report of November
the sixteenth, 1843, from which I have already quoted, the
subject of waiving the State's liens is considered and dis-
cussed.    An estimate of the cost of completing the work to
Cumberland had been made, but the officers of the company,
fearing that the sum named might fall below the actual
amount ultimately needed, say in the report :

" In order, however, to give full strength to the credit of
the company, so as to enable it to procure the required sum
upon fair and advantageous terms, it will be indispensably
necessary to *waive* the State liens to a much larger amount "
(than the sum estimated), " so that a broad and tangible
basis may be presented for the bonds to rest upon."    Fur-
ther on, in discussing the proposed sale of the State's in-
terest, a subject then much agitated and theretofore directed
by Act of Assembly to be made at a designated price, the
report proceeds : " But, even if the policy of authorizing an
immediate sale to be adhered to, a *waiver* of the liens to an
amount necessary to complete the canal and pay the accru-

ing interest on the cost of completion to the extent and for
the time mentioned, can in no way prejudice the measure."
Then, after showing that even should the State's interest be
sold the purchaser would have either to advance to the com-
pany the sum necessary to finish the canal and take a sec-
ondary lien, which to him would be the same thing as a
preferred lien, or he would have to waive his lien so as to
enable the company to borrow money elsewhere, it con-
tinues : " In either event, the existing liens," that is the liens
held by the State, " must and will be regarded by capital-
ists in estimating their values, as of a *deferred or secondary*
dignity to the sum that may be necessary to complete the
canal." * * * " There can then, we think, be no
shadow of objection to an *immediate postponement of the
State liens in favor of the required amount,* so as to enable
the company at once to enter into a fair and properly guarded
contract to finish the work." (Page 21 Report). On Au-
gust the twenty-eighth, 1843, General Coale, then but re-
cently elected president of the company, wrote to Barings,
Brothers and Company, bankers of London, inquiring
whether *if the State's liens were removed* a sufficient sum
to complete the canal could be secured on the company's
bonds. He asked whether these bankers would be able to
negotiate the loan, "provided the Legislature of Maryland,
at its next session, will waive its liens so as to enable the
company to give preferred liens on the nett revenues and
tolls of the entire canal to secure the payment of principal
and interest." And he continued, showing his and the di-
rectors understanding of the effect of the proposed legisla-
tion : " The Maryland State liens *on the canal* would become
*by this arrangement secondary liens.*" Going back to a still
earlier date, June the twenty-eighth, 1843, the president and
directors by resolution adopted on that day declared : " That
whenever the priorities of the State shall be waived and
postponed, and the company be thus placed in a condition
to exercise exclusive control over the revenues *and prop-
erty* of the company, the board will promptly enter into a

contract for the completion of the work." And in the re-
port of the agents representing the State, made to the Legis-
lature of Maryland on February the fifth, 1844, it was said :
" That a pledge of *all* the revenues of the company cannot
be construed to mean merely the *net* revenues, is too plain
to admit of argument ;" whilst in concluding the report,
which was signed by Samuel Sprigg, A. B. Davis, and John
Van Lear, Jr., and in referring to the special report of No-
vember the sixteenth, 1843, the State agents say : " That
it is therein (the report of November sixteenth) made mani-
fest, that the work can now be completed, if the liens of the
State are postponed, as has been asked for." In a com-
munication addressed by the president of the company to
the House of Delegates on February the twenty-fourth,
1844, in explanation of the views of the company's officers
respecting the scope and purposes of the Act of Assembly
then pending before the Legislature and providing. for a
waiver of the State's liens, it was stated : " It must be borne
in mind that the State is not now appropriating money, nor
authorizing an issue of State bonds as heretofore, nor pledg-
ing the faith and credit of the State for the repayment of the
money that may be raised. She does nothing more than
*postpone* her present unavailable liens, so as to enable the
company to give a *preferred lien upon the prospective
revenues* of the canal for the repayment of the bonds
that may be issued to complete it and render it productive."
In January, 1844, the company presented a memorial to
the Legislature of Virginia seeking an amendment of the
charter in several respects, but particularly asking that ex-
press authority to borrow money be conferred. The me-
morial, after suggesting that the authority should be given
in such terms as not to be susceptible of being construed
into an interference with existing liens, proceeded in these
words : " We feel confident, however, that if this be done,
Maryland will waive and *postpone her claims upon the com-
pany* by a separate law, as that is the only mode now re-
maining by which the work can be finished, &c." Whilst

the Act of 1844 did not allow the issue of bonds to the
limit requested, viz., two millions of dollars, it did permit an
issue to the extent of one million seven hundred thousand
dollars upon a pledge, not of the *net* revenues and tolls, but
of *all* the revenues and tolls from the entire canal, precisely
as had been asked for; and such a pledge was obviously
understood, when the State waived, deferred and postponed
her liens, to mean a prior or first lien on the property out of
which the revenues and tolls were to arise; because in no
other way, as the lawyers of that day perfectly understood,
could the State's liens become by " this arrangement, sec-
ondary liens," or be regarded " as of a deferred and sec-
ondary dignity to the sum that may be necessary to com-
plete the canal." It was the manifest understanding of the
stockholders and officers of the canal company that to the
extent of one million seven hundred thousand dollars and
accruing interest, these bonds were to be prior in all respects
to the liens of the State; and the bondholders unequivo-
cally entertained the same view. In a lengthy and able re-
port made by William H. Swift and Nathan Hale for Thomas
W. Ward, agent of Baring, Brothers and Company, in Feb-
ruary, 1846, *after* the Act of 1844, had been passed, that
Act was thus interpreted: " The State of Maryland thus
*releases its claim upon the Canal company* for all advances
made to it, and the interest thereon, *so far as to give a
preference to this loan.*" Again: " It is now proposed to
pledge *the whole property, with its entire income,* after de-
ducting the necessary expenses of repairs and management,
as security for the loan still necessary to complete the
canal." And the understanding which the Legislature
must have had, with all the sources of information which
it possessed before it, is correctly set forth, I think, in
the second and seventh sections of the Act of 1844. From
these events and expressions, some immediately preceding,
some accompanying and some following the passage of the
Act of 1844, which embodied language whose legal signifi-
cance was thoroughly understood when it was used, it

appears to me clear that the State of Maryland, through her Legislature, the canal company through its stockholders and officers and the persons who subsequently became holders of the bonds designed and intended that the lien of the bonds should extend to the " whole property " as well as to " its entire income."

Assuming, without conceding, that there is a doubt as to the meaning of the terms of the contract embodied in the Act of 1844 and in the mortgage of 1848, I have just above, as is permissible in such instances, invoked the construction which all the parties interested in that contract put upon it; because the construction which the parties themselves adopted is entitled to great consideration. *Citizens' Ins. Co.* v. *Doll,* 35 Md. 89; *Mitchell* v. *Weddeburn,* 68 Md. 145. It seems to me, then, from this very imperfect review of the history of the canal, its objects and purposes, the difficulties that beset its construction and which had to be surmounted to secure its completion, the expected benefits which the State looked forward to the realization of from her large investments in the enterprise, and the clear and consistent construction placed by the State, the stockholders and the bondholders upon the terms of the Act of 1844, that the Legislature did not design when waiving the State's liens and permitting bonds to be issued on a pledge of the revenues and tolls, to draw the distinction which is now advanced to the effect that the bondholders have a lien only on revenues and tolls, and the State a paramount lien on what the Attorney-General calls the *corpus* of the canal.

Apart from all that I have said, the Act of 1844 on its face furnishes a strong reason why the lien of the bonds was placed on the entire property through the medium of the revenues rather than by any other mode of description. This reason and the grounds in support of it are so ably and forcibly set forth by that distinguished and accomplished lawyer, Mr. Bernard Carter, in his brief filed in the case of *The State* v. *Brown et al.,* 73 Md. 484, that I take the liberty of quoting some passages from it.

"The State of Maryland, in chartering the canal company, and in assisting with the large sums of money it had spent on it, was moved by large expectations of great benefit to the State and its people, by the construction of what, in those days, was looked upon as a great public work ; and it was well known that even when completed, it might, in its early history, have to struggle with difficulties which might prevent prompt payment of the interest on the bonds about to be issued ; this is apparent on the very face of the Act of 1844 ; therefore, the State determined that it would, while waiving all beneficial interest or ownership on its part in the property of the canal company, by giving to the bonds to be issued to complete the canal, an absolute and preferred lien on all the revenues of the company, at the same time make such provision that every opportunity should be given to the company to live, and under its management, controlled by the State, through its ownership of the majority of the stock, to serve the great public purposes for which it had been created.

"Acting upon this view, there was incorporated those provisions in the Act of 1844, which declared that, while all the revenues of the company should be devoted to the payment of the interest on the bonds, and eventually to the payment of the principal, yet enough of these revenues should, in the first place, be taken for the purpose of paying the expenses and repairs necessary to keep the canal in operation and as a going concern ; in other words, that as long as the canal company could, from its earnings, pay its expenses and keep its works in repair, so as to keep open and in operation this great (as it was expected to be) waterway, it should be so kept open and in operation ; and if it took all its earnings to do so, so that there was nothing left of said earnings to be applied to the interest and principal of said bonds, the bondholders must be content, as long as the canal was thus running, to go without payment ; provided, always, such failure of earnings was not owing to want of business caused by faulty management by the company.

" The two great objects which the State sought to accomplish in the plan embodied in the Act of 1844 (and which are apparent on its face), were : 1st, to get the canal completed to Cumberland ; 2d, to so arrange matters that the highway should be kept in operation to subserve the great public benefit which it was supposed it would be to the State at large and her perple ; and that it should be in charge of the company, in which she had a controlling voice ; and, provided, any persons could be found to advance the money on terms which would accomplish these two objects, she was perfectly willing, in their favor, to subordinate all pecuniary claims which she had in the property of the company, under her mortgages.

" Therefore, in pursuance of this plan, and to accomplish these objects, the bondholders were not given a mortgage on the land and works of the company, which, if accompanied with the rights usually attendant on such mortgages, would have given the mortgagees the right, on default, to sell the canal property, and thus oust the company and the State from its control ; but a first and absolute lien was given on the entire revenues derivable from the property of the company, which as effectually transferred to them all the beneficial interest in the property of the canal held by the State, until their debts were paid, and yet retained the control of the management of the canal in the company, and so, under the control of the State."

Obviously, then, the form of the mortgage that was executed in 1848, was adopted for the purpose of preventing the mortgagees from disturbing the management of the company by the State—the majority stockholder—at least until the maturity of the bonds, rather than the usual mortgage under which the mortgagee could foreclose upon a default and destroy the State's interest. This was the reason that induced the Legislature to fasten the lien on the canal through the revenues and tolls ; and the creation of the lien by the pledge of the revenues and tolls was consequently not designed to restrict the scope of that lien simply to the

revenues and tolls divorced from the property out of which they were to issue.

But assuming I am altogether wrong in supposing that the lien of the bonds of 1844 extends to the canal, itself, and conceding that it does not, but that the State alone has a lien on the physical structure, I come to another question upon which my views go much farther and are perhaps more radical than those expressed by JUDGE FOWLER. That question is : Would a decree ordering a sale of the canal under existing conditions, and directing the proceeds of sale to be distributed to the State in preference to the bondholders of 1844, impair the obligation of the contract under which the bonds of 1844 were issued and are held ? To answer this question intelligibly it will be necessary to allude briefly to the origin and progress of the litigation which led up to the decision in *The State* v. *Brown et al.*, 73 Md. 484 ; and incidentally to recur to some of the facts narrated in an earlier part of this opinion.

The great and disastrous flood which caused such widespread and appalling destruction in the spring of 1889, completely wrecked and demolished the canal as a navigable waterway. Navigation upon it was suspended and the company was utterly bankrupt. It was not only receiving no revenues and tolls, but it was wholly unable to earn them ; for little of the great work, whose construction spanned a period of twenty-two years and cost $11,071,176, was left, when the swollen waters of the Potomac subsided. Being hopelessly insolvent the company was without means to make repairs or even to arrest the progressive decay which disuse promoted and accelerated. In this condition of things a bill setting forth these facts was filed on the equity side of the Circuit Court for Washington County on the last of December, 1889, by the trustees of the bondholders of 1844, against the Chesapeake and Ohio Canal Company and the trustees named in the mortgage of 1878, praying that a receiver be appointed to take charge of the property and works of the company and to repair and oper-

ate the canal for the purpose of raising revenue with which
to pay off the debts of the company; and also praying for
general relief. In January, 1890, the trustees under the
mortgage of 1878 filed their answer. A few days after-
wards the canal company answered, protesting against the
appointment of a receiver but urging and insisting on an
immediate sale of the entire property.

On the same day the Attorney-General of Maryland,
acting under authority of joint resolutions adopted by the
Legislature on the preceding day made application to the
Court for leave for the State of Maryland to become a party
defendant, and upon leave being granted, he filed in behalf
of the State an answer resisting the appointment of receivers,
and insisting on a sale of the canal and all the property of
the company. In the meantime, that is, on January the fif-
teeenth, 1890, the trustees under the mortgage of 1878
(which I have not thought it necessary to allude to hereto-
fore because it has no bearing on the questions I started out
to discuss), filed a bill in the same Court against the canal
company and the trustees of the bondholders of 1844,
praying for the appointment of receivers and for a foreclo-
sure of the mortgage of 1878, and a sale of the canal and
all its property. This bill was answered by the defendants
and the State also became, after leave, a party defendant.
The cases were subsequently consolidated, and on March
the third, 1890, the Circuit Court appointed three receivers
with instructions to make an examination and report upon
the condition of the canal and the probable cost of repair-
ing it, for such further action as the Court might deem nec-
essary. The receivers made their report with great partic-
ularity and thoroughness. In August, 1890, the Attorney-
General amended the answers filed in behalf of the State
by inserting the following paragraph: " The State now, by
its Attorney-General, prays the Court to pass a decree in
this case for the sale of the canal and all the franchises and
property of the canal company, as described in the three
mortgages from the Chesapeake and Ohio Canal Company

to the State of Maryland, the first bearing date on the 23rd
day of April, 1835 ; the second dated the 15th day of May,
1839 ; and the third dated the 8th day of January, 1846."
Copies of these mortgages were filed with the answers.
Thereafter the trustees of the bondholders of 1844 filed a
petition asking to be allowed to take possession of the
canal under their mortgage of 1848, so that they might re-
construct and restore the canal as a waterway and then op-
erate it.   This was resisted by the State.   On the second
of October a decree was passed for a sale of the canal, but
by the fifth clause of that decree it was provided that the
" decree of sale shall be stayed and suspended " for four
years from May the first, 1891, upon certain conditions
therein named which need not be repeated here.   By the
sixth clause it was declared that if at the end of four years
there shall not have been tolls and revenues collected from
the canal to liquidate the amount expended in restoring the
canal, such deficiency (*unless the time be extended by the
Court for good and sufficient cause shown*) shall be deemed
conclusive evidence that the canal cannot be operated so as
to produce revenue, " and the right and power is hereby re-
served to this Court to order and direct the execution of
the foregoing decree of sale."   From this part of the decree
suspending the sale the State of Maryland appealed, and after
an elaborate argument in this Court, the decree was affirmed.
*The State* v. *Brown et al.*, 73 Md. 484.   Before the four years
elapsed the trustees made application for an extension of
the stay under the sixth clause above referred to, and the
Circuit Court for Washington County further postponed the
sale for a period of six years accounting from the first of
May, 1895.   The State again appealed, and this appeal
brings up the question of the priorities of the liens and
presents the other inquiry I am now considering, viz., the
right of the State to insist on or to ask for a sale of the
canal under existing circumstances.   By virtue of the
decree and under the provisions of the mortgage of 1848,
the trustees of the bondholders of 1844 took possession of

the dismantled and wrecked canal, and at an expense of
four hundred and thirty-five thousand dollars, restored the
waterway and placed it in a better condition than it had
been, perhaps, since its completion in 1850.    These trustees
are earning revenues and tolls, and the record discloses the
fact that the receipts are steadily and largely increasing ;  and
that a recently organized transportation company has alone
guaranteed one hundred thousand dollars of tolls and
revenues annually.

What, then, is it that the State proposes to, do ?   She de-
nies that the holders of the bonds of 1844 have any lien
except upon the revenues and tolls.   She insists that if there
should be no revenues and tolls payable to the company by
reason of a sale of the property at the State's instance, then
the holders of the bonds of 1844 are entitled to nothing and
the State would be entitled to the whole proceeds of sale
after the bonds of 1878 shall be paid.    And she demands a
sale under her mortgage (which expressly stipulates that
the lien of the bonds of 1844 is " *in no wise to be lessened,
impaired or interfered with* by " that mortgage " or by any-
thing " therein contained) even though the result of such a
sale would, according to her own contention and conces-
sion, render the bonds of 1844 absolutely worthless.

In the contract made under the mortgage of 1848 be-
tween the bondholders of 1844 and the company whose
canal it was declared by the three States that chartered it
" shall *forever* be esteemed and taken to be *navigable* as a
public highway," there was a specific power and authority
given to the trustees to enter and take possession of the
canal and receive its revenues " upon the default of the com-
pany to fulfill its engagements in the premises," subject to
the condition that so long as the company complied with its
agreement by paying all the interest on the bonds of 1844
as that interest fell due, and by providing an adequate sink-
ing fund it should retain the management of the canal, but
if it failed " to comply with these conditions from any cause
except a deficiency of revenue arising from a failure of busi-

ness, without fault on the part of said company, then the grantees (the trustees) may demand and shall thereupon receive possession and shall appropriate all said tolls and revenues in the manner" provided in the mortgage. By the Act of 1844, which embodied a contract between the State and the prospective bondholders, it was expressly provided that the liens of the State shall be held as "waived, deferred and postponed" in favor of the bonds of 1844, so as to make the bonds "preferred and absolute liens on the revenues" "*until said bonds and interest shall be fully paid.*" And in the mortgage of January the eighth, 1846, given to the State and accepted by it as already set forth, the grant to the State was made distinctly subject to the provision that the liens and pledges made in behalf of the bonds of 1844 are "in no wise to be *lessened, impaired or interfered with by this deed*, or by anything herein contained." This mortgage to the State, approved by her then Attorney-General, was executed and delivered *two and a half years* before the mortgage of June the fifth, 1848, securing the bonds of 1844 was signed. Can the State of Maryland, now, by these or any other proceedings, impair the obligation of these contracts?

The decree for a sale of the canal when passed was properly passed because the canal was at that time a total wreck; but conditions have changed by reason of the reconstruction of the canal and its restoration as a navigable highway by the trustees of the bondholders of 1844 in the early part of the four years during which the execution of the decree for a sale was suspended. The right of the State to insist on a sale under its mortgage of 1846, as she now does through her Attorney-General *on this appeal*, must be measured by the circumstances as they exist to-day, and not by those that surrounded the question in 1890.

A State can no more impair the obligation of her own contract than she can impair the obligation of an individual's contract. In entering into a contract a State lays aside her attributes of sovereignty and binds herself substantially as

one of her citizens under his contract, and the law which guages individual rights and responsibilites guages, with few exceptions, those of the State. *Hartman* v. *Greenhow*, 102 U. S. 672; *Poindexter* v. *Greenhow*, 114 U. S. 270; *Keith* v. *Clark*, 97 U. S. 454; *Trustees of W. & E. Canal Co.* v. *Beers*, 67 U. S. 448; *Fletcher* v. *Peck*, 6 Cranch, 87. In *Ohio Life Ins. Co.* v. *De Balt*, 57 U. S. 416, the Supreme Court said: "The sound and true rule is that if the contract when made was valid by the laws of the State as then expounded by all the departments of its government and administered in its Courts of justice, its validity and obligation cannot be impaired by any subsequent act of legislation of the State or decision of its Courts altering the construction of the law." It is thus held that the obligation of a contract may be impaired by the decision of a State Court of last resort, but when no State statute or constitutional provision affecting a contract is upheld by a State Court of last resort, a mere decision on the contract, is not, according to the recent cases, within the meaning of the Federal Constitution, a law whose enforcement will, of itself, confer jurisdiction on the Supreme Court to review the State Court's ruling; but if jurisdiction exists in the Supreme Court on other grounds, such ruling may be reviewed. *New Orleans Water Work Co.* v. *Louisiana Sug. Ref. Co.*, 125 U. S. 18; *Brown* v. *Smart*, 145 U. S. 454. It must be the Constitution or some law of the State which impairs the obligation of a contract, or which is otherwise in conflict with the Constitution of the United States; and the decision of the State Court must sustain the Constitution or the law of the State in the matter in which the conflict is supposed to exist, or the case for the Supreme Court does not arise. *Mo. & M. R. Co.* v. *Rock*, 71 U. S. 177; *Knox* v. *Exchange Bank*, 79 U. S 379. I will recur to this line of cases later on..

I take it, then, that the State can no more impair through her judiciary, her own contract, than she can impair the obligation of the same contract through her Legislature;

Md.],          Separate Opinion by McSherry, C. J.

though a mere decision impairing the obligation of a contract will not authorize the Supreme Court to review that judgment. But this phase of the case does not rest here. There is a preliminary difficulty in the path of the State which I wish to allude to now.

The joint resolutions adopted by the General Assembly on January the thirtieth, 1890, after reciting that it was "necessary that the rights and interests of the State should be represented in" the proceedings pending in the Circuit Court for Washington County, instructed the Attorney-General to intervene in said proceedings in the name of the State of Maryland and "*take such steps*, after consultation with the Board of Public Works, as may be necessary *to resist the appointment of receivers and the creation* of any *additional debt* to take precedence over the claims and liens of this State." This resolution, in my judgment, gave the Attorney-General no authority to apply for a sale of the canal and conferred upon the Board of Public Works no power to direct the Attorney-General to pray for the passage of such a decree. It gives neither to the Attorney-General nor to the Board of Public Works authority to take the pending appeal or to ask that the order extending the period of the trustees' possession be reversed. Its object obviously was not to procure affirmative relief by way of a sale, but to prevent the doing of what was sought by the bondholders of 1844—the appointment of receivers and the issual of receivers' certificates to defray the expense of repairing the canal. Limited as the scope of the resolution was to a mere resistance of the relief asked by the 1844 bondholders, the application for a sale went far beyond its terms, and was consequently unauthorized. The application for a sale was unauthorized because the State of Maryland had not, through her Legislature, directed a foreclosure of her mortgage, and no other department of the State government was clothed with authority to determine whether there should be a foreclosure and sale at the instance of the State. I have before me all the minutes of the pro-

ceedings of the Board of Public Works relating to the Chesapeake and Ohio Canal Company between January the first and December the thirty-first, eighteen hundred and ninety, and there is not, as I read them, a single resolution instructing the Attorney-General to ask for a sale of the canal.   The Attorney-General has, therefore, no authorization from the State to ask this Court now to reverse the order appealed from and to remand the case that a sale may be had.   Consequently the State is not in reality rightfully on the docket as the appellant, and hence ought not to be heard to complain of the order extending the period of the trustees' possession.

, But if I be wrong in placing the construction I have on the joint resolutions of 1890, and if it be said that the question as to what those resolutions did in fact authorize, has been settled by the decree passed on the second of October, 1890, upon the prayer of the State for a sale, then the joint resolutions must have been interpreted as meaning that the Attorney-General, under the direction of the Board of Public Works, was empowered to ask for a foreclosure of the mortgage of 1846.   That such was the understanding of its import by the Board of Public Works is quite apparent from the fact that there is no pretence the Attorney-General had any other authority from the Legislature to ask for a sale, and from the further fact that the State appealed from the suspension of the decree for a sale by direction of the Board of Public Works adopted on November 26th, 1890, and through the Attorney-General insisted on an immediate sale, and has again appealed from the order extending that suspension till 1901, and again insists on a sale.   There is no statute or resolution passed by the Legislature and now in force directing any steps to be taken for the foreclosure of the State's mortgages, and it must have been upon the assumption that this particular joint resolution of January the thirtieth, 1890, did contain such a direction that the decree was asked for and obtained and that the immediate execution of that decree is now so vigorously pressed.   If

this be so, then the joint resolutions, whilst not in express terms directing a sale to be applied for under the State's mortgage, are in effect a law which, in its construction and practical execution, impairs the obligation of the bondholders' contract and is forbidden to be passed.  " Any enactment, from whatever source originating, to which a State gives the force of law, is a statute of the State within the meaning of the clause cited relating to the jurisdiction of this Court."  *Williams* v. *Bruffy*, 96 U. S. 176.  That these joint resolutions do impair the obligation of the 1844 bondholders' contract, if they authorize the Attorney-General to ask for a sale, is scarcely open to dispute.  Upon the hypothesis that these bondholders have no lien on the property of the canal—and this is what the State insists on—any action by the State under legislative authority which results in depriving these bondholders of their lien on revenues and tolls by a sale of the canal, at her instance, directly impairs the obligation of the contract made by the State in the fourth section of the Act of 1844, wherein her rights and liens were waived, deferred and postponed in favor of these bonds " until said bonds and interest are fully paid."  And such a proceeding at the suit or instance of the State would likewise invade the contract made by the State in the mortgage of 1846, because by that mortgage the State explicitly covenanted that the lien of the bonds of 1844 " are in nowise to be lessened, impaired or interferred with by this deed, or by anything herein contained," whereas it is by virtue of that very deed that a sale is asked for, and a sale would, as conceded by the State and as contended for by her, wipe out and sweep away the bonds of 1844, and would result in the proceeds of sale being turned over to the State after the bonds of 1878 were first fully paid.  There could scarcely be suggested a more flagrant breach of a contract than this would be.

In order to come within the provision of the Constitution of the United States which declares that no State shall pass any law impairing the obligation of contracts, not only must

the obligation of a contract have been impaired, but it must have been impaired by a *law* of the State. The prohibition is aimed at the legislative power of the State and not at the acts of administrative or executive boards or officers, or the doings of corporations or individuals. *New. Orl. W. Co.* v. *Lousi. Sug. Ref. Co.*, 125 U. S. 18. Nevertheless, an ordinance of a municipal corporation may be such an exercise of legislative power delegated by the Legislature to the corporation, having all the forms of law within the municipality, that it may properly be considered a law within the meaning of the constitutional prohibition, *U. S.* v. *New Orleans*, 98 U. S. 381. Thus in *Murry* v. *Charleston*, 96 U. S. 432, it appeared that the City Council of Charleston, upon which the Legislature of South Carolina, by the city charter, had conferred the power of taxing persons and property within the city, passed ordinances assessing a tax upon bonds of the city, and thus diminishing the amount of interest which it had agreed to pay, the Supreme Court held such ordinances to be laws impairing the obligation of contracts, for the reason that the city charter gave limited legislative power to the City Council, and when the ordinance was passed under the supposed authority of the legislative act, its provisions became the law of the State.

Now, whilst an independent action by the Board of Public Works, based on no legislative authority at all, and directing the Attorney-General to institute proceedings for the foreclosure of the State's mortgages would not have been, technically speaking, a law of the State, within the meaning of the Federal Constitution as interpreted by the decisions alluded to ; yet the joint resolutions empowering the Attorney-General to take steps for the protection of the State's liens, under the supervision of the Board of Public Works, was a delegation to some extent at least of legislative authority. And if under that resolution, as construed by the Board of Public Works, that board authorized an application to be made for a sale under the State's mortgages, it would be difficult to maintain that the resolution

was not a law impairing the obligation of the State's contract. Were this otherwise it would be the simplest thing in the world for a State to evade the provisions of the Federal Constitution, and to destroy a contract with perfect impunity by just such a resolution as that of January the thirtieth, 1890. If by refraining on the face of a legislative enactment to direct a prohibited thing to be done whilst entrusting to an executive board, by the same enactment, a masked discretion and authority to do that very forbidden thing, the thing *can* be done without a violation of the Federal Constitution, substance would be sacrified to form, and the most solemn obligations could be broken down in the teeth of the paramount law that protects them from impairment. (See 4, G. & J. 109).

There were but three of the parties to the consolidated cases who asked for a sale of the canal, and they were the canal company itself, the bondholders of 1878, and the State of Maryland. As to the canal company it can scarcely be heard, since the restoration of the canal as a subsisting waterway, to ask that the property be sold, when the result of such a sale might and probably would be the discontinuance or abandonment of the canal, notwithstanding the declaration in its charter that it should forever be a navigable highway ; and certainly would culminate, at the instance of the debtor company, in a deliberate violation of a formal and explicit contract between it and its creditors, the bondholders of 1844, who furnished upon the faith of its perpetuation, the means for the completion of the work at a time when the State of Maryland, whose credit was so impaired that her securities were selling in the money markets of Europe at fifty cents on the dollar, was, though largely interested as stockholder and creditor, powerless to render further assistance. No Court of Equity ought to heed the appeal of a debtor for the sale of his incumbered property under judicial process, when by such a sale his creditor who resists and protests against it, would, according to the debtor's own contention, be stripped of the only lien he has. Such a pro-

ceeding would permit the debtor, through a Court of con-
science, to repudiate his most binding obligations. This
can never be tolerated.

The bondholders of 1878 are eliminated from the case—
they have parted with their bonds which are now held by
the trustees of the bonds of 1844, and these trustees are
subrogated to all the rights of the 1878 bonds. Instead
of a sale being asked for in the interest of the bondholders
of 1878, the present holders of those bonds are now
vigorously resisting a sale.

The State of Maryland is, consequently, the only party
seeking a sale. She is the only party appellant in the
cause, and no one else demands a sale of the canal or
resists a further suspension of the decree of October, 1890.
Her Legislature has not directed that an application for a
sale should be made in the State's behalf, nor has she made
the request in any way except through her Attorney-
General. Now, the Attorney-General was either authorized
by the Legislature to press for a sale, or he was not. No
other branch of the State Government besides the legisla-
tive, possessed or possesses authority to direct a foreclosure
of the State's liens on the canal. If you say the Attorney-
General was not authorized by the General Assembly to
ask for a sale, then the State is not now properly in Court
demanding a foreclosure. And if she is not property in
Court for that purpose, a sale at her request cannot be
ordered. If, on the other hand, you say the Attorney-
General was authorized to press for a sale, there is no pre-
tence that he was given that authority by any other enact-
ment than the joint resolution of January the thirtieth,
1890; and if you concede that these resolutions conferred
upon him the right to urge, in the name of the State, a
sale, then you must admit that the resolutions are an enact-
ment by the Legislature that impairs the obligation of a
contract, and are, therefore, wholly inoperative and void.
In neither event, then, could a sale now be ordered at the
suit of the State; and as no other party to the cause—save

the bondholders of 1878—can insist on a sale, and as the present holders of those bonds are protesting against a sale, a sale cannot now be ordered at all. And as a sale cannot *now* be ordered at all, it would be an utterly nugatory and meaningless form to reverse the order appealed from, and to remand the case to the Court below.

There is one other view that I take of the subject, to which I wish briefly to make allusion. By the provisions of the decree of October, 1890, under which the trustees of the bondholders were placed in possession of the canal for the limited period of four years, it was declared that the trustees should repair the canal at their own proper cost and expense. Estimates of the probable cost of such repair, and very careful estimates had been made by the exceedingly accomplished receivers, Messrs. Joseph D. Baker, Richard D. Johnson and Robert Bridges ; but because of subsequent freshets and other unforseen causes the actual expense incurred in restoring the waterway was largely in excess of those estimates. The trustees of the bondholders undertook the work in good faith, and pushed it forward as rapidly as was possible, but unavoidable delays occurred, whereby many months of the four years allotted to the trustees as the term of their possession, elapsed before navigation was reopened. They expended $435,000, as I have already mentioned, and the four years expired before they were able to repay from the earnings of the canal this large sum of money. Whilst it is true they took the risk, under the strict and literal letter of the decree, of getting back in four years from the tolls and revenues the money thus expended to reconstruct the canal, it is equally true that this very money placed the canal in a condition of repair, which, should it be sold, would cause it to bring a vastly higher price than it could have possibly sold for, had it been left in the wrecked and broken state which the flood of 1889 produced. To the extent that this money, so expended, strengthened the liens of all the creditors, the trustees, by its expenditure, benefited the lien

holders; and if the State be conceded to have a priority over the bonds of 1844, though deferred to the bonds of 1878, the State would be greatly benefited in the event o a sale by. reason of the enhanced value of the property, enhanced at the expense of the very people who, according to the contention of the State, would in all human probability, get no part of the proceeds of sale, because of their lien being so far deferred as to be beyond reach in the distribution of the purchase money likely to be bid and paid for the canal.   It seems to me, then, notwithstanding the terms of the decree, if a sale were *now* ordered, the plainest precepts of equity and justice dictate that these bondholders or persons who advanced the $435,000 to reconstruct the canal, should be refunded out of the proceeds of sale, the money they expended, in the highest good faith, to give the canal a saleable value.   Because no provision of this sort was assented to, I could not (even had I not entertained the other views I have expressed on other branches of the case) have consented to a sale of the canal.

The reasons I have set forth in this opinion are the ones that influenced me to concur in an affirmance of the order extending the time during which the trustees of the bonds of 1844 may continue to hold possession of and operate the canal.

(Filed July 22nd, 1896.)

BRYAN, J., delivered the following supplemental opinion:

It is very unusual for a judge of this Court to file a supplemental opinion.   But I trust that a statement of my views will show weighty and sufficient reasons for the course which I have adopted.   The reasons for my conclusions will be stated with simplicity; in no controversial spirit, and most certainly with no diminution of the unfeigned respect which the judgments of my learned brothers always receive from me, and which they are justly entitled to receive.

When the Court, after a long advisement, determined

that the priorities in the distribution of the proceeds of sale
should be settled before the sale took place, and therefore
ordered the question to be argued at the bar, it was natural
to suppose that it had come to the conclusion to order a
sale.   At least this was my inference from the order.   The
event has shown that I made a mistake.   The opinions in
opposition to a sale which have been filed by the learned
Judges, refer to matters which, when I wrote my former
opinion, I did not consider as subjects of controversy in this
case.   In the amended bill in equity, which the trustees,
under the Act of 1844, filed in the Circuit Court for Wash-
ington County, they alleged that the Act of 1878 was
invalid, and that consequently the bondholders under that
Act had no lien on the property of the canal.   And they
prayed among other things that the Court would determine
the status of these bonds.   The trustees for these bond-
holders in their answer allege that the Act of 1878 is abso-
lutely valid and binding, and that the bonds issued under
that Act are a first lien on the whole estate and property of
the canal, both *corpus* and revenues.   They further allege
that the Act of 1878 was passed at the earnest request and
solicitation of the canal company, and with the privity and
assent of the then trustees under the Act of 1844.   They
further state and insist that the mortgage under the Act of
1844, given to secure the bonds issued under that Act, and
the statute authorizing its execution, confer no lien what-
ever on the *corpus* of the canal, but only on such surplus of
its revenues as might remain after paying the necessary
and proper repairs and expenses of the work under the
administration of the canal company.   The answer of the
State of Maryland alleged, among other things, that the
lien of the bondholders under the Act of 1844 was on the
tolls and revenues of the canal, and not on the " canal
property itself," and it prayed for a decree for sale.   The
trustees under the Act of 1878 filed a bill in their own
behalf praying also for a sale.   The two cases were con-
solidated by the order of the Court, and were heard as one

case. . The trustees under the Act of 1844 filed a petition praying that the case should be referred to an auditor to report on the priority of the liens on the canal so that the bondholders whom they represented might know before the sale what rights they had as to the proceeds of sale, and thus be enabled to protect them ; and alleging that a sale, when the creditors' rights were unknown and unsettled, would be equivalent to turning the property over to a certain named bidder who would have no competitor. The Court determined that it was reasonable and proper to settle the question as to the right and position of the bondholders under the Act of 1844 before decreeing a sale. The question being thus presented with all possible clearness and distinctness, it was decided that the lien given by the Act of 1844 was limited to the net tolls and revenues of the canal company; and that upon failure of that security the bondholders under that Act occupied the position only " of ordinary non-lien creditors of the company." It was also decided that the Act of 1878 was valid. And thereupon, in pursuance of these decisions, a decree for sale of the canal was passed with the suspensory clauses so often mentioned in the discussion of this case. This decree has never been reversed ; it was affirmed in the only appeals which have been taken from it. It must have the effect of settling conclusively and absolutely the questions decided, so far as the parties to the suit are concerned. They can never litigate them again in this case, or in any other. The matter decided is *res adjudicata.* In *Henderson* v. *Henderson,* 3 Hare, 115, the Vice-Chancellor said : " In trying this question, I believe I state the rule of the Court correctly, that where a given matter becomes the subject of litigation in and of adjudication by a Court of competent jurisdiction, the Court requires the parties to bring forward their whole case, and will not, except under special circumstances permit the same parties to open the same subject of . litigation in respect of a matter which might have been brought forward as a

part of the subject in contest, but which was not brought forward only because they have, from negligence, inadvertence, or even accident, omitted a part of their case. The plea of *res judicata* applies, except in special cases, not only to the points upon which the Court was required by the parties to form an opinion and pronounce a judgment, but to every point which properly belonged to the subject of litigation, and which the parties, exercising reasonable diligence, might have brought forward at the time." This decision was approved and adopted by the Supreme Court of the United States in *Beloit* v. *Morgan*, 7 Wallace, 622, and also in *State* v. *Brown*, 64 Maryland, 204 ; *Trayhern* v. *Colburn*, 66 Maryland, 279 ; *Albert* v. *Hamilton*, 76 Maryland, 309 ; *Barrick* v. *Homer*, 78 Maryland, 258. I think, then, that it is thus settled beyond any further controversy that the bondholders under the Act of 1844 have no lien, and that the Act of 1878 is valid and that the canal must be sold. And every other question is settled which is involved in these conclusions. It cannot escape attention that the Act of 1878 by its third section granted to the bonds then proposed to be issued a lien on the property, tolls and revenues in preference to any rights or liens which the State had on the same, "and also in preference to *any other claims or liens* upon the said Chesapeake and Ohio Canal Company, or its works or property." Now, the State could not grant such a lien, unless at the time it held a lien superior to all other claims on the canal. Consequently the validity of this Act is founded on the fact that the State had a lien on the *corpus* of the canal superior to any claim of the bondholders under the Act of 1844.

As nothing can be added to the binding effect of a valid decree by a Court of competent jurisdiction, it may be said that it is superfluous and unnecessary to say anything in support of its correctness. And so it would be in ordinary cases. But in questions of such vast public interest as those involved in this litigation the Judges would gratify a reason-

able expectation by stating the grounds which, in their opinion, show the justice and propriety of decrees which have been rendered. It was from a consideration of this kind that I devoted a large portion of my former opinion to a discussion of the priorities. I do not desire to add anything to what was then said. But some other questions must now be considered. Much stress has been laid on the fourteenth section of the charter of the canal company. It is in these words : "And be it enacted, that the said canal and the works to be erected thereon in virtue of this Act, when completed, shall forever thereafter be esteemed and taken to be navigable as a public highway, free for the transportation of all goods, commodities and produce whatever, on payment of the tolls to be imposed, as provided by this Act, and no other toll or tax whatever for the use of the said canal and the works thereon erected shall at any time hereafter be imposed but by consent of the said States, and of the United States." By the third section of the Act it had enacted that the " Chesapeake and Ohio Canal Company " should be incorporated and should have perpetual succession. So the fourteenth section could not have been intended to grant it the right to hold the canal in perpetuity, inasmuch as it necessarily had this right under the third section. It was rather a perpetual restriction on the right of the corporation to impose any tolls or taxes whatever for the use of the canal and its works except those provided by the act of incorporation. It manifestly was not intended to protect the canal property from the claims of creditors, who might by the ordinary processes of the law acquire a right to have it sold for payment of debts due to them. The charter was granted by the Legislatures of Virginia and Maryland and by the Congress of the United States, acting in concert for the purpose. It was a contract with the canal company, and was not repealable by any or all of the Legislatures which granted it. But they could amend it with the consent of the canal company. It was amended by the Act of the Legislature of Virginia passed January, 1844,

confirmed by the Act of the Legislature of Maryland passed February, 1844, known as chapter 124 of the Laws of 1843, likewise confirmed by an Act of Congress approved February 7th, 1845, and the amendment accepted by the stockholders of the canal company in general meeting.   This amendment gave the canal company the power to borrow money to carry into effect the objects authorized by its charter; to issue bonds or other evidences of such loans, and to pledge its property and revenues for the payment of the same in such form and to such extent as it might deem expedient.   Whatever might have been thought before the passage and acceptance of this amendment, there can be no doubt that afterwards the canal company had full power to execute mortgages of its property.   When the canal company, in accordance with its corporate powers, executed mortgages on its property in the usual form, it ought not to be seriously questioned that the mortgagees had the right to foreclose them and sell the property.   The charter granted to the canal company perpetual corporate existence, and it had therefore the right to hold the canal in perpetuity as a navigable highway.   But a perpetual charter does not exempt a corporation from the obligation to pay its debts and from the claims of its creditors.   An individual has the right to hold his land to him and his heirs forever; but this right is subordinate to the claims of his creditors and does not prevent them from selling it.   It would be a most anomolous conclusion to hold that when it acquires a power to mortgage its property, and does voluntarily mortgage it, the creditor is debarred from the rights universally arising from a contract of mortgage.

In the able opinion of the Chief Justice the position is taken with great strength that we ought to look at certain documents and statements (which he mentions in his opinion) for the purpose of ascertaining the views and purposes with which the parties entered into the contract made by the Act of 1844.   It is true that the meaning of the contract is what both parties intended at the time it was made.

But this meaning must be expressed on the face of the contract itself, and it cannot be affected by anything said before or at the time of the contract, or afterwards. The rule of interpretation applicable to written contracts is thus stated in 1 *Greenleaf's Evidence*, section 275 : " When parties have deliberately put their engagements into writing, in such terms as import a legal obligation, without any uncertainty as to the object or extent of such engagement, it is conclusively presumed that the whole engagement of the parties, and the extent and manner of their undertaking was reduced to writing ; and all oral testimony of a previous colloquium between the parties, or of conversations or declarations at the time when it was completed, or afterwards, as it would tend in many instances to substitute a new and different contract for the one which was really agreed upon, to the prejudice, possibly, of one of the parties, is rejected." It must be observed that the learned author speaks of " *oral*" testimony of a colloquium, or of conversations or declarations, &c., &c: Of course, he does mean to imply that if either of the parties should reduce to writing such conversations or declarations the rule of interpretation would be different. This is obvious enough from the reason of the case. He was noting the difference between *oral* and *written* evidence and his meaning is made perfectly clear by the two sentences immediately preceding the passage quoted. " By written evidence, in this place, is meant not everything which is in writing, but that only which is of a documentary and more solemn nature, containing the terms of a contract between the parties, and designed to be the repository and evidence of their final intentions. *Fiunt enim de his (contractibus) scripturae, ut, quod actum est, per eas facilius probari poterit.*" We must also bear in mind that the instrument embodying the contract is a public statute, which no one except the Legislature has power to alter, vary or modify in any particular. And the Legislature could not do so except by another statute. Therefore none of the documents and statements mentioned by the

Chief Justice were made by any authority which could bind the State. I infer that the Act of 1844 is to be construed in the ordinary and accustomed manner; not forgetting that the surrounding circumstances and the public history of the times are to be considered. The Supreme Court of the United States, in construing an Act of Congress, said in *Aldridge* v. *Williams*, 3 Howard, 24 : " In expounding this law, the judgment of the Court cannot, in any degree, be influenced by the construction placed upon it by individual members of Congress in the debate which took place on its passage, nor by the motives or reasons assigned by them for supporting or opposing amendments that were offered. The law as it passed is the will of the majority of both houses, and the only mode in which that will is spoken is in the Act itself ; and we must gather their intentions from the language there used, comparing it, when any ambiguity exists, with the laws upon the same subject, and looking, if necessary, to the public history of the times in which it was passed." And to the same effect was the opinion in *United States* v. *Union Pacific Railroad*, 91 United States, 72. The documents referred to by the Chief Justice do not appear in the record, and were not brought to my attention. This must be my excuse for not noticing them in my former opinion. Counsel sometimes indulge themselves in a loose practice of stating matters which do not appear in the record; but every paper should be inserted in the record which it is desired that we should pass upon ; or it should, by leave of the Court and agreement of counsel, be exhibited, and left with us as if it had been so inserted. I see no agreement of counsel in the record with reference to any additions or amendments except on the two hundred and twenty-eighth page ; and that refers to the annual reports of the canal company from the fiftieth to the fifty-ninth inclusive, and to the sixty-first. These have never been filed in Court ; and their dates show that they are long subsequent to the documents and statements in question.

Some criticism has been made respecting the right of the Attorney-General to insert in his answer a prayer for the sale of the canal. The Legislature of 1890, by Joint Resolution No. 1, among other things stated as follows : " For the last twelve years the said canal has been maintained and operated at an average annual deficiency of fifty-six thousand dollars ; and it is now apparent that in its present deplorable condition, its restoration as a waterway capable of earning annual revenues sufficient to pay its ordinary current expenses is wholly impracticable, and that a sale or lease of said work is sooner or later inevitable." It also passed Joint Resolution No. 2, as follows : " Joint resolution authorizing the Attorney-General to intervene in pending suit to protect the State's interest in the Chesapeake and Ohio Canal.

" Whereas, the proceedings now pending in the Circuit Court for Washington County and in the Supreme Court of the District of Columbia, for the appointment of a receiver of the Chesapeake and Ohio Canal Company, and for a decree of foreclosure of the mortgage executed by the canal company under the Act of eighteen hundred and seventy-eight, chapter fifty-eight, affect most vitally the interests of this State ; and whereas, if a receiver should be appointed and receivers' certificates should be issued for the purpose of raising funds to restore the canal, a heavy additional debt must necessarily be created, which will take priority over the liens now held by this State to the great prejudice of her claims ; and whereas, it is necessary that the rights and interests of the State should be represented in said proceedings ; therefore, be it resolved, that the Attorney-General be and he is hereby instructed to intervene in said proceedings in the name of the State of Maryland, and to take such steps after consultation with the Board of Public Works as may be necessary to resist the application for a receiver, and the creation of any additional debt to take precedence over the claims and liens of this State." The Attorney-General made known this authority to the Court and

was admitted to appear for the State of Maryland as a party defendant. He answered both the bills filed in the Court for Washington County. And afterwards, on his petition he obtained leave to amend both of his answers and insert a prayer in each of them for a sale of the canal ; and he accordingly made the amendments. The Legislature stated that proceedings were pending for the appointment of a receiver and for a foreclosure of the mortgage, and the instructions to the Attorney-General were that he should resist the application for a receiver. The only way to defeat this application was to obtain a decree of sale, and he knew that the Legislature had declared that a sale or lease was inevitable. It was a necessary part of his duty to exercise his best judgment to determine the proper means of preventing a receivership. And no one had a right to control his judgment as counsel in regard to the proper management of his case. The Court decided that he had a right to amend his answers and pray for a sale, and it made this prayer, thus authorized, one of the grounds of its decree. No objection was made to this decision of the Court at the time or afterwards by any of the parties to the suit ; but the suit went on in regular course to a final decree. If any objection existed it ought to have been made at the time, and brought to the attention of the Court. No rule of practice would authorize the other parties to the suit to go to trial on this prayer without dissent and then raise an objection for the first time after a final decree had been rendered. This would be far more inadmissible than joining issue on a plea and then moving to strike it out for irregularity. It is a familiar practice that this cannot be done. *Stockett* v. *Sasser*, 8 Maryland, 374. Many cases are mentioned in *Hutton* v. *Marx*, 69 Maryland, 255 and 256, where a party loses the benefit of a right if he does not claim it at the proper time and in the appropriate manner. The proceedings in this case have been well known to all persons interested in the public affairs of this State, yet three sessions of the Legislature have passed since the decree for

sale was rendered, and no dissatisfaction has been expressed in regard to the action of the Attorney-General. At the last session, in section second of chapter 136½, this decree is mentioned, and provision is made for a disposition of a portion of the proceeds of sale to which the State would be entitled. So we may fairly infer that the Legislature sanctions the construction given by the Attorney-General to Joint Resolution No. 2. I may dismiss the further consideration of this question by the remark that this decision of the Court is involved in the decree which stands unreversed. Even if the State had opposed the granting of the decree, its effect and operation would have been the same. All the lienors are entitled to the benefit of it. Where several mortgagees are parties to a suit and a sale is decreed on the prayer of one of them, the rights of all are respected and protected ; and each one has a vested interest in the sale to the extent of his debt. It would be very singular if it were otherwise, inasmuch as after the decree none of them could maintain a foreclosure suit on his mortgage. It would be merged in the decree.

This State having the first lien on all the lands, property and rights, net tolls and revenues of the canal company, makes the contract contained in the Act of 1844. I think that I have shown in my first opinion that this contract secured to the bondholders under the Act of 1844 "*the surplus net revenues,*" as they are styled in the fifth section of the Act, and nothing more. It did not give them the right to take possession of the canal in any contingency. The mortgage given by the canal company to the trustees under the Act of 1844 (which was executed in 1848) gave this right under certain conditions, which have been frequently mentioned in the discussion of this case. But this right, although good against the canal company, could not be asserted in opposition to a prior mortgagee whose title was paramount to that of the canal and to all interests derived from it, whether by mortgage or otherwise. According to the opinion of this Court (in *Virginia* v. *Canal Company*, 32

Maryland, 538), the security of these bondholders was
"only upon expected tolls and revenues, and only on so
much of them as might remain after repairs and other ex-
penses were first provided for." And it was also, in the
opinion of the Court in the same case, subject to the
right of the canal company to issue bonds for the pur-
pose of obtaining the necessary funds, and subject to
the right to pledge its after-accruing revenues for the
payment of such bonds. And in the mortgage of 1848,
given to secure these bondholders, it is expressly stated
that their claims are to be provided for "after the pay-
ment of the debt now existing, *and that may hereafter
be contracted* and in arrear for repair of the canal, and for
officers' salaries." When the storm of 1889 had wrecked
the canal it was the duty of the canal company to restore
it, if it could obtain the means to do so by pledging its
future tolls and revenues. But this was entirely impossible,
and the company itself was hopelessly insolvent. It has not
even yet been suggested that anyone would have loaned the
necessary funds on such security as it was in the power of
the company to offer. The future tolls and revenues could
have been pledged with priority over the pledge made by
the Act of 1844; but the Act of 1843, chapter 124, which
authorized the canal company to pledge its property and
revenues expressly provided that the prior rights and liens
of the State of Maryland, under mortgages theretofore made
to it, should not be impaired except in so far as the same
should thereafter be waived, deferred or postponed by the
Legislature. When there were no means of operating the
canal any further there was no legal or rightful impediment
to a sale. But the Court, at the request of the trustees,
under the Act of 1844, suspended the sale and allowed
them to make the experiment which has already been men-
tioned, at their own expense. It has been made, and has
failed. The canal has not earned anything approximating
its expenses. The time for which the sale was postponed
expired on the first day of May, eighteen hundred and

ninety-five.    And the proposition now before us is for a
further postponement.    The rights of these parties are mat-
ters of contract.    The engagements of the State were com-
pletely fulfilled by relinquishing the net tolls and revenues
and by permitting the canal company to remain in posses-
sion of the land and use every attainable and possible means
to earn tolls and revenue.    When its existence had termin-
ated as a living agency capable of carrying on its work the
possibility of net tolls and revenues was gone forever, and
the decree was passed for a sale of its property.    The
further postponement of the sale enables subsequent mort-
gagees to hinder, delay and defeat liens prior in time and
superior in title, which have been adjudicated in the most
authoritative manner known to law.    A prior mortgagee
whose right of sale has been matured is entitled to a sale
without delay, and his right cannot be postponed to suit the
convenience or interest of a subsequent lienor, who may
suppose that by being put in possession of the property he
may make enough from it to pay his own claim. . The
rights of the prior mortgagee are secured by solemn con-
tract, and, in my humble judgment, no Court has the right
to impair or delay them.    And certainly no Court has the
right to impose as a lien on the property, prior to those al-
ready existing, the expenditures which a subsequent lienor
has made for the promotion of his own interest in carrying
out an experiment which was made against the earnest op-
position of a prior mortgagee.

I have thought it due to myself that I should state the
reasons for the judgment which I have formed on the ques-
tions which have been discussed.    But it is also due to
myself in a far higher degree that I should put on record
my cheerful testimony that the opinions of my brother
Judges are eminently entitled to great consideration and re-
spect.

 (Filed October 3rd, 1896).